

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-26-2005

# Caver v. City of Trenton

Precedential or Non-Precedential: Precedential

Docket No. 04-2600

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Caver v. City of Trenton" (2005). *2005 Decisions.* Paper 587.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/587

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NO. 04-2600
_____

LIMMIE CAVER; LAWRENCE M. DAVIS;
JOSEPH FINNEY; JOSEPH RICHARDSON;
BROTHER OFFICERS LAW ENFORCEMENT SOCIETY;
TERESA CAVER, As the Wife of Limmie Caver;
KAREN DAVIS, As the Wife of Lawrence Davis; LAFAYETTE
SUTPHIN,

v.

THE CITY OF TRENTON; THE TRENTON POLICE DIVISION;
ERNEST WILLIAMS, Individually and in his Official Capacity;
DENNIS KEENAN, Public Safety Director, Individually and in his
Official Capacity;
JAMES A. WALDRON, JR., Former Public Safety Director,
Individually and in his Official Capacity;
PAUL J. MEYER, Individually and in his Official Capacity;
DANIEL MCKEE, Individually and in his Official Capacity;
JOSEPH VALDORA, Individually and in his Official Capacity;
FRED REISTER, Individually and in his Official Capacity;
RONALD COLE, Individually and in his Official Capacity;
JOSEPH CONSTANCE, Individually and in his Official Capacity;
THOMAS COPPALECCHIA, Individually and in his Official
Capacity;
RICHARD KOKOTALAJ, Individually and in his Official
Capacity;
ALFRED AULETTA, Individually and in his Official Capacity;

ROBERT DEFEO, Individually and in his Official Capacity;
THOMAS MURPHY, Individually and in his Official Capacity;
JOHN DOES, NO. 1 THROUGH 50, Individually and in their
Official Capacity;
THE TRENTON POLICE BENEVOLENT ASSOCIATION
LOCAL 11;
ROBERT SMITH, Trenton PBA President, Individually and in his
Official Capacity;
JOSEPH NOCERA, Trenton PBA Member, Individually and in his
Official Capacity;
LEONARD CIPRIANO, Trenton PBA Member, Individually and
in his Official Capacity; JOHN DOES, Trenton PBA
Officers/Members, No. 1 through 10,
Individually and in their Official Capacity; JOHN R. GABAUER

Lawrence M. Davis,
                                        Appellant

—————————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 99-cv-01636)
District Judge: The Honorable Garrett E. Brown, Jr.

—————————

Argued June 7, 2005

BEFORE: FUENTES, VAN ANTWERPEN and BECKER, <u>Circuit
Judges</u>

(Filed: August 26, 2005)

2

Kevin Kovacs (Argued)
Purcell, Ries, Shannon, Mulcahy & O'Neill
Crossroads Business Center
One Pluckemin Way
P.O. Box 754
Bedminster, NJ 07921

*Counsel for Appellant Lawrence M. Davis*

Herbert I. Waldman (Argued)
Nagel Rice & Mazie, LLP
103 Eisenhower Parkway
Roseland, NJ 07068

Susan S. Singer (Argued)
Singer & Goger
Renaissance Towers
111 Mulberry Street, Th-1A
Newark, NJ 07102

Joel B. Korin
Kenney & Kearney
220 Lake Drive East
Woodland Fall Corporate Park
Suite 210
Cherry Hill, NJ 08034

*Counsel for Appellee City of Trenton*

---

OPINION

---

VAN ANTWERPEN, <u>Circuit Judge</u>

Appellant Lawrence Davis brought various federal and New Jersey state law claims against his employer, the City of Trenton, alleging unlawful discrimination, retaliation and hostile work environment. Before this Court are six challenges on appeal from the five-plus year litigation that ensued. Davis first appeals the District Court's September 28, 2001, grant of summary judgment on his retaliation claim brought under the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, <u>et seq</u>. Second, Davis challenges the District Court's denial of his Motion to Vacate the summary judgment order. Third, he appeals the District Court's denial of his Motion to Amend the Final Pretrial Order. Fourth, Davis appeals the District Court's apparent dismissal of his hostile work environment claim at the close of evidence. Fifth, Davis challenges evidentiary rulings that limited his ability to present psychiatric evidence. Finally, Davis claims that the District Court erred in applying a "determinative factor" standard to his retaliation claims. For the reasons set forth below, we affirm the District Court's disposition of this case in all respects.

I.

A.      <u>Background</u>

Davis is a police officer of African-American descent who began working for the Trenton Police Department ("the Department") in August 1990. Prior to the events that gave rise to this litigation, Davis had been a successful officer in the K-9 unit of the Department. He has received a number of commendations for meritorious service and was never subject to discipline from the beginning of his employment until May 1998.

4

The long and complicated procedural history of this case began on April 9, 1999, when Davis, along with four other African-American officers and the Brother Officers Law Enforcement Society ("BOLES"), filed a Complaint in federal district court. The plaintiffs filed an Amended Complaint on October 7, 1999, and a Second Amended Complaint on May 1, 2000. Since then, all of the plaintiffs with the exception of Davis have settled their claims with the City, and only Davis' case went to trial. On March 19, 2004, a jury returned a verdict in favor of the City in Davis' case.

Only Counts One, Four, Seven, and Sixteen of the 16-count Second Amended Complaint are relevant to the issues presented to this Court. Count One alleged that the defendants created a hostile work environment for Davis and other African-American officers in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., and the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1, et seq. In Count Four, Davis alleged race-based retaliation in violation of Title VII and the LAD. Count Seven set forth a retaliation claim under the CEPA, New Jersey's "whistle-blowing" statute. Finally, Count Sixteen, which was not part of the original Complaint, alleged that Davis suffered continued discrimination, harassment, and retaliation in violation of Title VII, the LAD, and the CEPA after the filing of the original Complaint with the District Court.

B.      Factual History

### Racial insensitivity in the Department

Davis testified that he overheard other officers, including two of his superiors, Lt. Joseph Valdora and Cpt. Daniel McKee, use hurtful racial slurs to describe African-Americans on a number

5

of occasions throughout the 1990s. On one occasion, McKee read a memo about the City's harassment policy, which stated that officers should not be harassed for their membership in social groups, and told Valdora, in front of all of the other officers, "see, the chief just said it's okay to be in the KKK." (Pa486.)[1] Davis' testimony mainly concerned comments made by Valdora and McKee to African-American prisoners and detainees. Davis did not testify that other officers ever directed racist comments at him personally. Davis also sought to show that the City failed to address complaints of racist graffiti being written on bathroom walls and racist flyers being posted at headquarters.

### Problems with the Department's Communications Center

In addition to problems with the racial insensitivity of other officers, Davis claimed that he began to experience problems with the Department's Communications Center ("the radio room") in the summer of 1997. The radio room is responsible for dispatching and assigning officers and for keeping records of which officers have been dispatched to particular jobs. Davis said he observed mistakes in the radio room's record-keeping, and he was erroneously assigned to multiple jobs at the same time. He also objected to being assigned to cases that he believed were inappropriate for a K-9 officer.

In July 1997, Davis confronted the radio room supervisor, Joe Woodcock, with his concerns. Around the same time, according to Davis' testimony, an unidentified radio room

---

[1] Throughout this opinion, we will use "Pa" to refer to pages in the appendix submitted by Plaintiff-appellant Davis, and we will use "Da" to refer to pages in the appendix submitted by Defendant-appellee the City of Trenton.

employee informed Davis that he was being singled out by Woodcock. Davis believed that the only possible reason Woodcock would target him was his race. Davis began submitting memoranda to his supervisors indicating that the radio room was purposely falsifying information. Cpt. McKee forwarded one of these complaints to the Department's Communications Section for an investigation. McKee also drafted a memo to his superior, Deputy Chief Paul Meyer, agreeing that there were problems with the radio room's record-keeping that needed to be addressed.

On July 18, 1997, Davis met with Lt. Valdora and another superior officer, Sgt. John Kemler. They suggested that Davis not question the radio room staff directly about assignments, but rather approach his superior officers with any concerns. Valdora and Kemler also advised Davis that his problems with the radio room were not unique. Davis has since conceded that he knew problems in the radio room were widespread and that many white officers also had issues with inaccurate radio room record-keeping and inappropriate assignments. He nevertheless persisted in his belief that he was being singled out. After the meeting, Valdora wrote a memo to McKee, stating that he believed Davis was being "paranoid," even though he was an otherwise "bright, young officer." (Pa406.)

Davis continued to submit complaints about the radio room. One memo, which detailed a conflict between Davis and Woodcock over the radio, was forwarded to Internal Affairs for an investigation. Woodcock admitted to Internal Affairs that the radio room had problems with record-keeping and mistaken assignments. He denied, however, that Davis' concerns arose out of any personal dispute. On October 3, 1997, Internal Affairs determined that

Davis' harassment complaint was "Not-Sustained." (Pa410.)[2]  On January 9, 1998, Valdora wrote another memo to McKee, expressing concerns about Davis' behavior.  He stated that the most recent complaint was "a somewhat rambling account" of the radio room incident.  (Pa412.)

### Recommendations for psychiatric treatment

In the January 9, 1998, memo, Valdora reiterated that he thought Davis was "essentially a good officer," but that he was exhibiting "paranoid" behavior.  Valdora agreed that many of Davis' complaints about the radio room were well-founded, but he faulted Davis for attributing those problems to a personal or racial dispute.

> This irrational, obsessive behavior troubles me deeply.  Imagine if you will, Officer Davis arresting a civilian employee for official misconduct when the elements of the crime are completely absent from all reporting.  The civil liabilities would be tremendous.  Therefore, I would like to provide you a recommendation.  I would like to see Officer Lawrence Davis evaluated by a trained professional.

Id.

On January 11, 1998, McKee wrote a memo concerning Davis' behavior to Deputy Chief Meyer.  Like Valdora, McKee praised Davis' police work, but characterized his behavior

---

[2] After the Internal Affairs determination, radio room personnel submitted a complaint taking issue with the manner in which Davis responded to radio dispatches.

surrounding the radio room incidents as "paranoid." McKee also recommended that Davis be ordered to undergo psychiatric evaluation. He was subsequently referred to the Corporate Health Center, where Dr. Michael Makowsky ordered a psychiatric evaluation to determine whether there was a "reason for his apparent multiple personalities, one that appears paranoid." (Pa575.)[3] The City's psychologist, Dr. Douglas Logue, conducted the evaluation, found Davis to be fit for duty, and only recommended follow-up evaluations. Davis accordingly retained his full responsibilities.

**Alleged harassment by superior officers**

Davis also testified that, in January of 1998, around the time when Valdora and McKee recommended that he be ordered to undergo psychiatric treatment, they called him in for a meeting. He alleges that Valdora and McKee told him they would "shut [him] up" for "making waves" because the radio room complaints might jeopardize an informal arrangement with the dispatchers, referred to as "the bone," by which the radio room would cover for officers who went home early. (Pa481.) Davis claims McKee and Valdora also began making sarcastic remarks about him during the morning roll call.

---

[3] It appears that this referral was based in large part on the recommendations of Valdora and McKee. Dr. Makowsky's language here very closely tracks the language of McKee's January 11, 1998, memo, which stated, "I would respectfully recommend that the Police Division order Officer Davis to be evaluated to determine if there is a reason for his apparent multiple personalities, one that appears to be paranoid." (Pa417.)

On May 9, 1998, Valdora confronted Davis for violating an instruction not to enter the radio room.[4] Davis then submitted a private report alleging harassment by Valdora and McKee. On May 11, 1998, Valdora and McKee wrote memos requesting that disciplinary action be taken against Davis for insubordination. On the same day, Davis completed an EEOC intake form for use in a litigation being brought by the other BOLES members. On May 30, 1998, Davis was issued an official warning for allegedly violating the order to not enter the radio room. This was the first time Davis had ever been the subject of any formal discipline. The next day, he submitted a memorandum requesting that Internal Affairs conduct a full investigation of his claims of harassment by McKee and Valdora. Very shortly thereafter, Deputy Chief Meyer ordered Davis to go back to Dr. Logue for further evaluation, which he did on June 2, 1998.

### Assignment to administrative duty

After his second evaluation, Dr. Logue reported that Davis was developing a psychiatric disorder that required treatment. He recommended that Davis not be permitted to patrol with a gun. As such, the Department confiscated his gun on June 4, 1998, and assigned him to light administrative duty. Davis was later ordered to undergo further psychological testing to determine his fitness for duty, and he met with Dr. Jonathan Willard-Mack on August 19, 1998. Dr. Willard-Mack determined that Davis was not fit to return to full duty. At about the same time, Davis privately sought treatment from Dr. Peter Krakoff. In May 1999, after nine months of treatment, Dr. Krakoff provided a report to Dr. Makowsky, stating that Davis was fit for duty.

---

[4] Davis disputes ever actually being instructed not to enter the radio room for any reason.

**Involuntary sick leave and termination**

By the time Dr. Krakoff gave his report to Dr. Makowsky, Davis had already been on administrative duty for well over the six month limit imposed by Department policy. In the spring of 1999, Deputy Chief John Gabauer requested that Dr. Willard-Mack reevaluate Davis to determine if he was able to resume full duty.[5] Dr. Willard-Mack determined that his condition at the time was unchanged, and Dr. Makowsky concurred. As a result, Gabauer placed Davis on involuntary sick leave on August 19, 1999. He remained on sick leave for a year. In the meantime, Davis privately sought the opinion of yet another doctor and got a full psychiatric exam from Dr. Jodi Whitehouse in January 2000. Dr. Whitehouse forwarded a report to Dr. Makowsky indicating that Davis was fit for duty, but that report apparently had no impact on the City's view of Davis' fitness.

In October 2000, the City held a Departmental Hearing to determine whether Davis was psychologically unfit and should be discharged. Davis attended the hearing with counsel but did not present any testimony or evidence. He was officially terminated on October 13, 2000.

**Administrative appeal of termination**

Pursuant to the New Jersey State Civil Service Law, Davis challenged his termination in an administrative appeal to the New Jersey Merit System Board. The appeal was referred to the Office of Administrative Law and was assigned to an Administrative Law Judge ("ALJ"). The ALJ conducted an extensive hearing from

---

[5] By this time, the initial Complaint in the underlying discrimination and retaliation suit had already been filed with the District Court.

April to June 2002 to determine whether the City erred in finding that Davis was unable to perform his duties.[6]  On March 20, 2003, the ALJ found that he was fit for duty and that the opinions of Doctors Logue and Willard-Mack were inaccurate.  She also found that the City "improperly placed Officer Davis on light duty, improperly removed his weapon, improperly issued him an official warning, [and] improperly placed him on 'out sick' status. . . ." (Pa262.)

The ALJ went on further to state that the Department was irresponsible in its handling of Davis' radio room complaints and that supervising officers used his complaints as a basis "to intimidate him further by sending him for fitness for duty evaluations." (Pa260.)  The ALJ found that "this was deliberately done to either: seek his removal from the police department; to cause him to cease expressing his legitimate concern over issues regarding safety of officers and the residents of Trenton; or have him quit his job." Id.  Moreover, she found that the Internal Affairs investigation into the radio room incidents was a "sham," as was McKee's memo expressing concern about Davis' mental state.

The ALJ ordered Davis reinstated to his full duties and awarded him back pay and attorneys' fees.  On May 8, 2003, the Merit System Board affirmed the ALJ's decision without opinion and issued its Final Agency Order.  The City did not appeal.

**Ongoing issues**

---

[6] During this time, the proceedings in the underlying federal suit had been stayed by the District Court's March 28, 2002, Order for Administrative Termination, because one of the plaintiffs, Joseph Finney, had been activated for military duty overseas.

12

Davis claims that he continued to be discriminated and retaliated against after the ALJ ordered reinstatement. First, Davis claims the City stalled his reinstatement for several weeks and only reinstated him after the filing of an Order to Show Cause in the New Jersey state courts. Second, he alleges that when he did return to the Department, he was not reinstated to his prior position in the K-9 unit until he exerted pressure through the state courts. Third, Davis claims he was not given a proper dog when he was finally reinstated to the K-9 unit. Finally, Davis claims the City delayed giving him his back pay for several months after the entry of the administrative reinstatement order.

C.    Procedural History

Given the lengthy and complicated procedural history in this case, we will outline only those procedural developments that are relevant to the issues presented to this Court. As noted, the initial Complaint in this action was filed on April 9, 1999. After more than two years of discovery, the District Court granted partial summary judgment in favor of the City on September 28, 2001. The summary judgment order disposed of a number of the plaintiffs' claims, including Counts Four and Seven – Davis' retaliation claims under Title VII, the LAD, and the CEPA.

However, the court denied summary judgment on Count Sixteen, which alleged incidents of harassment, discrimination, and retaliation occurring after the filing of the initial Complaint. In a footnote, the District Court pointed out that Davis could not use Count Sixteen as a vehicle to revive the now-dismissed retaliation claims brought under Counts Four and Seven. Count One, alleging a hostile work environment, also remained alive, as neither party sought summary judgment on that count.

13

On April 5, 2002, the District Court entered a "Final Pretrial Order," setting the trial for May 7, 2002. However, as mentioned in note 6, supra, plaintiff Joseph Finney was subsequently activated for military duty overseas, and the court stayed proceedings. After the District Court reinstated proceedings in the summer of 2003, Davis filed two motions that are relevant to this appeal.

First, he moved to reconsider and vacate the District Court's entry of partial summary judgment on Counts Four and Seven. In support, Davis claimed: (1) New Jersey retaliation law had changed since 2001; and (2) the March 2003 findings of the ALJ were relevant to retaliation and should be binding on the District Court under the doctrine of collateral estoppel. The District Court denied this motion on February 12, 2004. Second, Davis moved to amend the Final Pretrial Order. He sought to expand the allegations in Count Sixteen to include the incidents of discrimination, harassment, and retaliation that allegedly occurred after the ALJ ordered reinstatement. The District Court denied this motion on October 20, 2003, and set the trial for March 2, 2004.

After a five-day jury trial, the District Court instructed the jury with regard to the Count Sixteen retaliation claims but did not instruct them with regard to a hostile work environment claim. On March 19, 2004, the jury returned a verdict in favor of the City on retaliation but did not rule on hostile work environment. Davis moved for a new trial on March 29, 2004, and the District Court denied the motion on May 3, 2004. He filed a Notice of Appeal with this Court on June 2, 2004.

II.

14

The District Court had subject matter jurisdiction over the federal claims contained in the Second Amended Complaint pursuant to 28 U.S.C. §§ 1331 and 1338, and had supplemental jurisdiction over the New Jersey state law claims pursuant to 28 U.S.C. § 1367(a). This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

III.

A.      Summary Judgment on the CEPA Retaliation Claim

1.      *Standard of Review*

This Court reviews lower court grants of summary judgment *de novo*, and we apply the same standard that the District Court should have applied. Union Pacific R.R. v. Greentree Transportation Trucking Co., 293 F.3d 120, 125 (3d Cir. 2002). Under Fed. R. Civ. Pro. 56(c), summary judgment should be granted only where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

2.      *Analysis*

Davis claims the City unlawfully retaliated against him because of his radio room complaints. The New Jersey CEPA makes it unlawful for an employer to take retaliatory action against an employee because he "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the

15

environment." N.J.S.A. 34:19-3(c)(3). New Jersey courts have created a four-pronged test for evaluating CEPA claims, which mirrors the three-pronged test used to evaluate federal unlawful retaliation claims under Title VII:

> A plaintiff . . . must demonstrate that: (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3c; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

Dzwonar v. McDevitt, 828 A.2d 893, 900 (N.J. 2003); Kolb v. Burns, 727 A.2d 525, 530 (N.J. Super. Ct. App. Div. 1999).

The District Court held that Davis failed to make out a *prima facie* CEPA claim because (1) his complaints were unreasonable; (2) being required to undergo psychiatric evaluations does not constitute an adverse employment action; and (3) any subsequent adverse employment action was not taken because of Davis' whistle-blowing. With respect to the first prong, the District Court concluded that Davis' complaints were unreasonable as a matter of law because he refused to acknowledge that he was not being harassed by radio room personnel. In so holding, the court noted that the CEPA "is not intended to spawn litigation concerning the most trivial or benign employee complaints," Estate of Roach v. TRW, Inc., 754 A.2d 544, 552 (N.J. 2000).

Davis argues that the District Court inappropriately made findings of fact on this issue. We agree. The Supreme Court of

16

New Jersey has clearly outlined the role of a trial judge in addressing the first prong of the CEPA standard:

> [T]he trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff. If the trial court so finds, *the jury then must determine whether the plaintiff actually held such a belief and, if so, whether it was reasonable*.

Dzwonar, 828 A.2d at 901-902 (emphasis added); see also Abbamont v. Piscataway Township Bd. of Educ., 650 A.2d 958, 967-68 (N.J. 1994).

In this case, the District Court properly determined that the complained of conduct (the radio room's poor record keeping and inappropriate assignments) implicates public policy concerns in that Davis' complaints "identified potential official misconduct issues." (Pa76.)[7] However, the District Court overstepped its bounds by deciding for itself whether the complaints were "trivial" or "reasonable." This is an issue of fact that has been specifically reserved for the jury under New Jersey case law.[8] Therefore, we

---

[7] The radio room complaints also implicate the state's public policy concerns for the safety of employees in the workplace, which are codified at N.J.S.A. 34:6A-3, because inaccuracies in police dispatching may place officers at risk. Cf. Cerracchio v. Alden Leeds, Inc., 538 A.2d 1292, 1298 (N.J. Super. Ct. App. Div. 1988).

[8] It is worth noting that the City does not argue to this Court that the District Court's factual findings here were somehow proper. Rather, the City has chosen to argue only the third and fourth prongs of the

17

could not affirm summary judgment based on the first element of a CEPA standard.

The District Court's alternative basis for summary judgment was that, even if Davis could satisfy the first two elements, he did not establish that he was subject to an adverse employment action under the CEPA *because of* whistle-blowing. The CEPA defines "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J.S.A. 34:19-2(e). New Jersey courts have interpreted N.J.S.A. 34:19-2(e) "as requiring an employer's action to have either impacted on the employee's 'compensation or rank' or be 'virtually equivalent to discharge' in order to give rise to the level of a retaliatory action required for a CEPA claim." Klein v. Univ. of Med. & Dentistry of New Jersey, 871 A.2d 681, 691 (N.J. Super. Ct. App. Div. 2005) (quoting Hancock v. Borough of Oaklyn, 790 A.2d 186, 193 (N.J. Super. Ct. App. Div. 2002)). The Superior Court in Klein elaborated further:

> Moreover, retaliatory action does not encompass action taken to effectuate the discharge, suspension or demotion but rather speaks in terms of completed action. . . . Nor does the imposition of a condition on continued performance of duties in and of itself constitute an adverse employment action as a matter of law, absent evidence of adverse consequences flowing from that condition.

Id. at 691-92 (internal quotations and citations omitted).

CEPA standard.

18

Similarly, in deciding a Title VII retaliation claim, this Circuit stated, "retaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997).[9] As such, in cases not involving actual discharge or refusal to hire, courts may find unlawful retaliatory conduct "only if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Id. (internal citations omitted). "[U]nsubstantiated oral reprimands" and "unnecessary derogatory comments" are not serious and tangible enough to constitute adverse employment actions. Id. at 1301.

In this case, there are two possible retaliatory actions relevant to Count Seven. The first is the Department's requirement that Davis submit to psychiatric evaluations. The second is Davis' transfer from the K-9 unit to light administrative duty.[10] We agree

_____

[9] Although Robinson involved a federal retaliation claim, the requirements to make out a *prima facie* CEPA claim mirror the Title VII requirements in that both claims require an adverse employment action and a causal link between that action and the protected activity. Moreover, the definition of adverse employment action provided in Robinson is consistent with the language of N.J.S.A. 34:19-2(e). Therefore, courts frequently apply a Title VII analysis in resolving New Jersey state retaliation claims. See, e.g., Donofry v. Autotote Systems, Inc., 795 A.2d 260, 269 (N.J. Super. Ct. App. Div. 2001); Kolb, 727 A.2d at 530; Bowles v. City of Camden, 993 F. Supp. 255, 261 (D.N.J. 1998).

[10] Davis' placement on involuntary sick leave and his termination were clearly adverse employment decisions, but those actions had not

19

with the District Court that ordering Davis to see a psychiatrist, without more, did not adversely affect his status as an employee. "[A]n adverse employment action involves some harm to an employee's employment opportunities." Nelson v. Upsala College, 51 F.3d 383, 388 n.6 (3d Cir. 1995); see also Robinson, 120 F.3d at 1300. Where an officer is not guaranteed a negative evaluation upon entering the psychiatrist's office, merely being required to undergo an evaluation does not harm the officer's employment opportunities.[11]  Davis' case actually illustrates this point because,

---

yet materialized when the initial Complaint was filed. Challenges to these post-Complaint decisions were thus made part of Count Sixteen and are not relevant to our discussion of the Count Seven CEPA claim.

[11] We also acknowledge that deference should be given to a police department's decision to refer an officer for psychiatric evaluation based on a supervising officer's recommendation. New Jersey courts have recognized an obligation on the part of police departments to ensure that their officers are well-trained and mentally stable. See McAndrew v. Mularchuk, 162 A.2d 820, 828-29 (N.J. 1960) (failure to adequately train officers could render a municipality vicariously liable for a wrongful shooting); see also Denis v. City of Newark, 704 A.2d 1003, 1008-1007 (N.J. Super. Ct. App. Div. 1998) (police department vicariously liable for an officer's assault on a civilian where the department knew or should have known about the officer's dangerous propensities). In holding that random and universal drug testing of police officers is permissible under the Fourth Amendment, this Court noted the "awesome and dangerous power" conferred to police officers and the "need in a democratic society for public confidence, respect and approbation of the public officials on whom the state confers that awesome power." Policeman's Benevolent Ass'n of New Jersey v. Washington, 850 F.2d 133, 141 (3d Cir.

after his first compelled psychiatric evaluation in 1998, he received a favorable determination from Dr. Logue, and the terms and conditions of his employment remained unchanged. Cf. Benningfield v. City of Houston, 157 F.3d 369, 376 (5th Cir, 1998) (referral of police officer for psychological testing to determine fitness for duty, in and of itself, "was not an adverse employment action. Rather, the referral was designed to gather facts to form the basis for an employment decision."); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 755 (4th Cir. 1996) (referral for psychological examination insufficient under Title VII where no adverse employment action actually resulted).

On the other hand, Davis' transfer to administrative duty was an adverse employment action under the standards articulated in Robinson, 120 F.3d at 1300, in that it significantly altered his duties and status as an officer. The administrative position carried much less prestige than did his position as a K-9 officer, and he was forced to turn over his weapon, thereby preventing him from performing many of the normal duties of a police officer. Thus, the transfer to light duty was essentially a demotion. The issue, then, is whether Davis made out a *prima facie* case for retaliation by presenting evidence that there was a causal connection between this demotion and his protected whistle-blowing activities.

Davis has not alleged that the Department's decision-makers relied on anything other than the psychiatric reports when they decided to assign him to light duty. He does not dispute that Chief Williams and Deputy Chief Meyer transferred him because they saw reports from trained professionals indicating that he was

---

1988). Accordingly, police departments should be able to refer legitimate concerns about the mental stability of their officers to the appropriate professionals.

not fit for duty, and not because they resented him for "blowing the whistle" on the radio room.  The only individuals that Davis alleges were directly motivated by his whistle-blowing activities were Valdora and McKee.  They were not, however, in a position to demote, transfer, or terminate Davis.

The extent of Valdora and McKee's alleged retaliatory conduct is the writing of memos suggesting that Davis be referred for psychiatric treatment.[12]  This leaves a gap in causation between the actions of Davis' supervisors, who may have had inappropriate motives but did not directly take an adverse employment action, and the eventual adverse employment decision made by the City.  When Davis' Count Sixteen retaliation claims went to trial in 2004, he attempted to fill this gap with the theory that the otherwise innocent decision-makers were tainted by the biased, untrue, and retaliatory memos of their subordinates, Valdora and McKee.

Some courts have held that an innocent employer who relied on a biased subordinate may be liable for retaliation under

---

[12] Davis continues to claim that Valdora and McKee also "retaliated" by harassing him at work.  But, harassment is not unlawful retaliation.  The CEPA is specifically designed to protect whistle-blowers from retaliatory discharges, suspensions, demotions and the like, but it does not provide a cause of action for generalized harassment.  See Young v. Schering Corp., 645 A.2d 1238, 1244 (N.J. Super. Ct. App. Div. 1994) (discussing the CEPA's legislative history); see also McDonnell v. Cissneros, 84 F.3d 256, 258 (7th Cir. 1996), cited in Robinson, 120 F.3d at 1301 (actions that "can cause distress" do not necessarily constitute adverse employment actions); Nelson, 51 F.3d at 388 (unlawful retaliation does not include "conduct in general which the former employee finds objectionable.").

Title VII or the CEPA.  See, e.g., Roach, 754 A.2d at 552 ("the jury could have inferred from the evidence that in deciding to terminate plaintiff, [the employer] relied on a 'tainted' evaluation prepared by [his subordinate]."); see also Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226 (5th Cir. 2000) ("If the employee can demonstrate that others had influence or leverage over the official decisionmaker, . . . it is proper to impute their discriminatory attitudes to the formal decisionmaker."); Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990); Abbamont, 650 A.2d at 965-66 (holding that a school board may be held vicariously liable under the CEPA for the retaliatory actions of its officials).

However, Davis' theory in connection with Count Sixteen at the 2004 trial was different from the theory he advanced in the initial pleadings and in opposing summary judgment on the Count Seven CEPA claim in 2001.  In reviewing the September 2001 summary judgment grant, we restrict our review to the submissions made to the District Court at that time.  Knoll v. Springfield Township Sch. Dist., 699 F.2d 137, 145 (3d Cir. 1983); see also MacGlashing v. Dunlop Equipment Co., Inc., 89 F.3d 932, 936 (1st Cir. 1996).  Prior to the entry of summary judgment, Davis' retaliation claim hinged solely on the allegation that Valdora and McKee sought *to embarrass and harass* him by forcing him to undergo unwanted psychiatric evaluations.  We reemphasize, however, that neither generalized harassment nor being referred for psychiatric evaluation are adverse employment actions for the purposes of sustaining a retaliation claim.

On the other hand, Davis' later trial theory went further by asserting that Valdora and McKee wrote intentionally false memos in order *to effectuate an adverse employment action*, knowing that their recommendations would lead to a negative evaluation from

23

the psychologists.[13]  This slight difference in theories is a critical one.  In 2001, Davis claimed the memos were only aimed at harassing him, rather than claiming they were intentionally fabricated and aimed at effectuating an adverse employment action.  These 2001 allegations were insufficient to meet the CEPA's causation element.

The Valdora and McKee memos may have been factual but-for causes of Davis' demotion.  However, unless they somehow improperly tainted the decision-making process (a crucial fact which Davis failed to allege in connection with Count Seven), it was Davis' actual receipt of a negative diagnosis that was the intervening and proximate cause of his adverse employment action.  This is especially apparent given that Dr. Logue initially found Davis to be fit for duty, notwithstanding the Valdora and McKee memos.  The pleadings alleged, at most, that Valdora and McKee had deplorable motivations for referring Davis for psychiatric evaluation.  But retaliatory *motive* on the part of non-decision-makers is not enough to satisfy the *causation* element of a CEPA claim.  Even viewing all reasonable inferences (that were available in September 2001) in favor of Davis, the proximate cause of his demotion was the mental health professionals' diagnosis that he was unfit for duty, not the supervisors'

---

[13] Counsel for Davis asserted at oral argument that he raised this theory in his November 17, 2000, Brief in Opposition to Defendants' Motion for Summary Judgment.  However, that brief contained no allegation that Valdora and McKee intentionally fabricated their accounts of Davis' behavior in order to get him fired or demoted.  At most, the brief alleged that Valdora and McKee characterized Davis as "paranoid" and recommended psychiatric evaluations *in order to harass him*.  (See Da155-57.)

24

recommendations.  Cf. Donofry, 795 A.2d at 269-70 (applying a proximate cause analysis to a CEPA retaliation claim).

We will therefore affirm the District Court's September 28, 2001, grant of summary judgment on Count Seven of the Second Amended Complaint.

B.      Motion to Reconsider and Vacate Summary Judgment

1.      *Standard of Review*

We review the District Court's denial of a motion to reconsider for abuse of discretion.  Coregis Ins. Co. v. Baratta & Fenerty, Ltd., 264 F.3d 302, 309 (3d Cir. 2001); Lorenzo v. Griffith, 12 F.3d 23, 26 (3d Cir. 1993).

2.      *Analysis*

Davis offered two bases to the District Court for granting reconsideration.  First, he argued that New Jersey retaliation law had changed since the entry of summary judgment.  Second, he argued that the many facts adduced from his state administrative proceeding were relevant to the retaliation claims and binding on the District Court under the doctrine of collateral estoppel.  Davis' submissions to this Court do not challenge the District Court's determination that reconsideration was not warranted based on recent New Jersey case law.  He has therefore waived his changed law argument, and we will only address the collateral estoppel issue.

Federal courts have held that agency determinations may be given preclusive effect in certain circumstances where the agency is acting in a judicial capacity.  See United States v. Utah Constr.

25

& Mining Co., 384 U.S. 394, 422 (1966). However, we agree with the District Court that collateral estoppel is not applicable in this case. At the outset, we note the Supreme Court's decision in Univ. of Tenn. v. Elliott, 478 U.S. 788 (1986), which prohibits the use of collateral estoppel to give an unreviewed state administrative determination preclusive effect in a Title VII action. See also Roth v. Koppers Indus., Inc., 993 F.2d 1058, 1062-63 (3d Cir. 1993). Therefore, because the ALJ's findings were not reviewed by any court of law in this case, they can have no binding effect on the District Court in deciding Davis' Title VII claims.

However, New Jersey courts have not categorically prohibited the application of collateral estoppel to unreviewed agency determinations in cases involving New Jersey state retaliation claims. See, e.g., Hennessey v. Winslow Township, 2005 N.J. LEXIS 810 (N.J. June 28, 2005) (analyzing whether an unreviewed agency decision should be given preclusive effect in an LAD action); Hernandez v. Region Nine Hous. Corp., 684 A.2d 1385, 1392 (N.J. 1996) (same); Ensslin v. Township of North Bergen, 646 A.2d 452, 461 (N.J. Super. Ct. App. Div. 1994) (terminated police officer's LAD claim precluded by an unfavorable agency determination from the Merits System Board). Therefore, we must look to the state's preclusion law in determining what effect, if any, the ALJ's determinations could have on Davis' state law claims. See Elliot, 478 U.S. at 799 ("federal courts must give the agency's fact-finding the same preclusive effect to which it would be entitled in the State's courts").

Under New Jersey law, collateral estoppel may only be applied where the following factors are satisfied:

26

> (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

Hennessey, 2005 N.J. LEXIS 810 at *7 (citations omitted); In re Estate of Dawson, 641 A.2d 1026, 1034-35 (N.J. 1994). We find that the fourth element is lacking in this case, and we will therefore affirm the District Court's refusal to apply collateral estoppel.

The ultimate issue before the ALJ was whether Davis was fit for duty as a police officer. Thus, the only truly essential aspects of the ALJ's findings were that Dr. Logue and Dr. Willard-Mack's testimony were lacking in credibility and that their conclusions regarding Davis' mental health were baseless. The other findings offered by the ALJ, regarding the reasonableness of Davis' radio room complaints, the motivations of Valdora and McKee, and the validity of the Internal Affairs investigation were not essential to the ALJ's judgment to reinstate Davis. While these findings may provide a background for the ALJ's ultimate conclusions, they do not bear directly on the ultimate question: Davis' fitness for duty. Because the ALJ's conclusions on such non-essential matters were at best nothing more than dicta, they can have no preclusive effect in litigating Davis' LAD and CEPA retaliation claims. The fact that the ALJ chose to touch on those issues in its opinion does not mean they were properly before the administrative body or essential to its holding.

27

For these reasons, we do not find an abuse of discretion in the District Court's denial of reconsideration, and we will affirm the February 12, 2004, Order denying the motion.

C.     Motion to Amend the Final Pretrial Order

1.     *Standard of Review*

We review a District Court's refusal to amend its pretrial order for abuse of discretion. Petree v. Victor Fluid Power, Inc., 831 F.2d 1191, 1194 (3d Cir. 1987).

2.     *Analysis*

Davis sought in October 2003 to amend the pretrial order to allow him to present evidence that acts of harassment, retaliation, and discrimination continued to occur after the ALJ ordered reinstatement. In denying the motion, the District Court noted, "We're talking about amending the complaint, the possible reopening of discovery, and delay of the case that has been far too long delayed." (Pa431.) The court also stated "We've got a case that's already been pre-tried. Discovery has been closed." Id. We find no abuse of discretion here.

Davis points out that the trial was scheduled for March 2004 and contends that any additional discovery could have been conducted in the remaining four months. However, the addition of Davis' new allegations could have involved not only amendments to the Complaint, but also other problems, including answers from the defendants, the taking of additional deposition testimony, and the reopening of motion practice. Such matters are best left to the District Court, which was well within its discretion to determine that the risk of delay would undermine "the orderly and efficient

28

trial of the case." Petree, 831 F.2d at 1194. Moreover, we find that reversal of the District Court's determination is not "required to prevent manifest injustice." Id. The District Court did not deprive Davis of his day in court on these new allegations, as he was not precluded from asserting them in a separate complaint. We will therefore affirm the District Court's October 20, 2003, denial of Davis' Motion to Amend.

D.    Dismissal of the Hostile Work Environment Claim

1.    *Appellate Jurisdiction*

Before reaching the merits of Davis' hostile work environment claim, we must first resolve the issue of whether the District Court's disposition of that claim constitutes an appealable final decision under 28 U.S.C. § 1291. Both parties assert the District Court "dismissed" the hostile work environment claim after the close of evidence. However, the docket does not reflect that the City ever made a motion to dismiss or that the District Court ever entered an order dismissing the claim, either with or without prejudice. Moreover, it does not appear that the District Court made any statements on the record formally dismissing the claim or entering judgment as a matter of law.

The District Court seems to have handled the hostile work environment claim largely off the record, and each party provides a slightly different account of the circumstances surrounding the so-called "dismissal." While the City claims that Davis' counsel abandoned the claim at an off-the-record charge conference, Davis disputes that he ever stopped pursuing a hostile work environment theory. At a March 15, 2004, sidebar conference, the following exchange took place between the District Judge and counsel for the City (Mr. Waldman):

29

THE COURT: In the course of the charge conference, I think counsel clarified exactly what they see as an issue.

MR. WALDMAN: So, as I understand the hostile work environment claim is no longer in the case?

THE COURT: That's my understanding.

(Pa604-605.) Davis' counsel responded by stating, "I thought there was still an element of hostile environment. . . ." (Id. at 605.) After a short exchange in which Davis' counsel explained his harassment theory, the court stated, "I just don't see that it fits into hostile work environment under either LAD or Title 7 based on the evidence that you've seen." (Id. at 606.) The only other treatment of hostile work environment conducted on the record occurred during the jury instructions, when the District Judge gave an instruction on retaliation but stated, "There is no claim here for hostile work environment." (Id. at 621.) Davis did not make a contemporaneous objection to that instruction.

In determining whether this disposition constitutes an appealable final decision, we are mindful that § 1291 is to be given a "practical rather than a technical construction." Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949). Decisions from both the Supreme Court and this Court have focused the inquiry on whether the lower court intended its ruling to have a final rather than a tentative effect. For example, in Bankers Trust Co. v. Mallis, 435 U.S. 381 (1978), the Supreme Court permitted appellate review notwithstanding the district court's failure to enter judgment on a separate document as required by Fed. R. Civ. P. 58. Because the lower court's intent to dismiss was clear despite the absence of a separate order, the Court reasoned:

30

> [N]othing but delay would flow from requiring the
> court of appeals to dismiss the appeal. Upon
> dismissal, the district court would simply file and
> enter the separate judgment, from which a timely
> appeal would then be taken. Wheels would spin for
> no practical purpose.

Id. at 385.

The effect of the District Court's actions here is unmistakable, and we therefore apply the reasoning of Bankers Trust, even though the District Court did not formally dismiss the hostile work environment claim on the record. The decision to remove a claim from the jury's consideration after the close of evidence and over the plaintiff's protest was clear and had the undeniable effect of a judgment in favor of the City on that claim. We will thus view the District Court's disposition as a judgment as a matter of law under the standards set forth in Fed. R. Civ. P. 50.

This conclusion is supported by our ruling in Shapiro v. UJB Fin. Corp., 964 F.2d 272, 278-79 (3d Cir. 1992). In that case, the district court granted plaintiffs leave to amend their complaint within 30 days to correct deficiencies in the pleading. The court neither formally dismissed the plaintiffs' claims nor expressly stated it would grant a dismissal if the plaintiffs declined to make the required amendments. We nevertheless construed the district court's actions as an appealable dismissal because "once the amendment period expired, the district court's order had the *effect of dismissing* the improperly pleaded claims with prejudice." Id. at 278 (emphasis added). Echoing on the reasoning of Cohen and Bankers Trust, this Court stated:

31

> It seems clear that the district court planned to dismiss with prejudice any claims not amended. Requiring plaintiffs to return to the district court now would be a wasteful elevation of form over substance.

Id. Similarly, by instructing the jury that "[t]here is no claim here for hostile work environment," it seems clear that the District Court in this case intended a judgment in favor of the City on that claim.[14]

### 2. *Standard of Review*

This Court's review of a judgment as a matter of law is plenary. Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 88 (3d Cir. 2000). Judgment as a matter of law is only appropriate where, viewing all reasonable inferences in the light most favorable to the non-moving party, "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue. . . ." Fed. R. Civ. P. 50(a)(1); Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir.1993).

---

[14] Our willingness to retain appellate jurisdiction should not be viewed as an approval of the District Court's handling of the hostile work environment claim. This Court has previously emphasized the importance of clearly memorializing decisions with separate written orders, see, e.g., WRS, Inc. v. Plaza Entm't, Inc., 402 F.3d 424, 428-29 (3d Cir. 2005); Schrob v. Catterson, 948 F.2d 1402, 1407 (3d Cir. 1991), and we continue to disfavor judgments not set forth in written orders. However, as we stated in Schrob, "[w]e do not approve of [the district court's] procedure, but we think that a holding that it deprives us of appellate jurisdiction would exalt form over substance." Id. at 1407.

3.      *Analysis*

Because we accept as true Davis' testimony regarding the racially charged atmosphere in the Department, the propriety of a judgment in favor of the City on his hostile work environment claim is an admittedly close issue.  That said, we hold that the evidence presented does not warrant a reversal of the District Court's judgment under either Title VII or the LAD.  Under Title VII, the evidence must establish that:

> (1) he suffered intentional discrimination because of his [race]; (2) the discrimination was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person of the same protected class in his position; and (5) there is a basis for vicarious liability.

Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001).  The hostile work environment standard under New Jersey law is strikingly similar:

> When a black plaintiff alleges racial harassment under the LAD, she must demonstrate that the defendant's "conduct (1) would not have occurred but for the employee's [race]; and [the conduct] was (2) severe or pervasive enough to make a (3) reasonable [African American] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive."

Taylor v. Metzger, 706 A.2d 685, 688-89 (N.J. 1998) (quoting Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 453 (N.J. 1993)) (modifications in original).

33

In evaluating a hostile work environment claim under both Title VII and the LAD, we are mindful that "offhanded comments, and isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile work environment claim. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), quoted in Heitzman v. Monmoth County, 728 A.2d 297, 304 (N.J. Super. Ct. App. Div. 1999). Rather, the "conduct must be extreme to amount to a change in the terms and conditions of employment. . . ." Id.

In determining whether the conduct at issue is sufficiently extreme, we consider the "totality of the circumstances." Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990). As such, "a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." Id. at 1484; see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993) ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."); Taylor, 706 A.2d at 692 ("Severity and workplace hostility are measured by surrounding circumstances."). The types of circumstances we consider "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23, quoted in Heitzman, 728 A.2d at 304.

According to Davis, the specific incidents that, when viewed cumulatively, contributed to his hostile work environment include: (1) McKee's comment to Valdora during roll call that it was "okay to be in the KKK"; (2) Valdora and McKee's use of racial epithets when dealing with prisoners; and (3) the racist graffiti and flyers placed around the Department by unidentified individuals. He also claims that certain facially neutral conduct, such as being referred for unwanted psychiatric evaluations and

34

being berated by Valdora and McKee during meetings, was aimed at harassing him because of his race.

We note first that no racist comment, written or spoken, was ever directed at Davis himself. In addition, Davis does not dispute that he never personally saw any racist graffiti or flyers in the Department; he heard about the graffiti and flyers second-hand. As a threshold matter, Davis cannot meet the first element of the hostile work environment claim under Title VII or the LAD – causation – *solely* by pointing to comments that were directed at other individuals. Davis cannot show that the comments would not have been uttered or written but for *his* race if Davis was neither on the receiving end nor the subject of any comments.[15]

Furthermore, comments referring to other individuals that were merely overheard by Davis are the sorts of "offhanded comments and isolated incidents" that the Supreme Court in Faragher, 524 U.S. at 788, cautioned should not be considered severe or pervasive enough to constitute a hostile work environment. Cf. Heitzman, 728 A.2d at 304-305 ("[A] derogatory comment about another person generally does not have the same sting as an ethnic slur directed at a minority group member."). Thus, although there was some evidence in this case of

[15] Davis relies on the Supreme Court of New Jersey's decision in Taylor for the proposition that "a single utterance of an epithet can, under particular circumstances, create a hostile work environment." 706 A.2d at 690. However, that case is easily distinguishable from the case at hand because the extremely derogatory "single utterance" involved in Taylor was directed at the plaintiff, whereas Davis has not come forward with any examples of racist comments being directed at him.

inappropriate[16] racist comments, graffiti, and flyers, this evidence was insufficient without more to establish a hostile work environment.

That said, Davis' claim was not based *solely* on comments that were directed at others; he also alleged that Valdora and McKee's conduct toward him, particularly their recommendations for psychiatric evaluation, was racially motivated. Although the racist comments involved in this case cannot alone be the basis of a hostile work environment claim, evidence of those comments may be considered in determining whether facially neutral conduct on the part of Valdora and McKee was actually based on Davis' race. See Cardenas, 269 F.3d at 261-62 ("[T]he advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment in evaluating a hostile work environment claim."); Hurley v. Atlantic City Police Dep't, 174 F.3d 95, 110-11 (3d Cir. 1999); Lehmann, 626 A.2d at 457.[17]

---

[16] It goes without saying that we strongly disapprove of the use of racial epithets, particularly by those charged with enforcing the law, but the fact that inappropriate comments were made is not enough on its own to sustain a cause of action for hostile work environment.

[17] As the Eastern District of Pennsylvania stated in a sex discrimination case, "While case law recognizes that offensive statements made to a female other than the plaintiff can contribute to creating a hostile work environment, the plaintiff in those cases had herself been a target of the discriminatory conduct at some point and the evidence of such conduct toward other female employees was used only to bolster the plaintiff's case." Cooper-Nicholas v. City of Chester, No. No. 95-6493, 1997 U.S. Dist. LEXIS 20810, at *13

A reasonable jury believing Davis' account of the surrounding circumstances – that Valdora and McKee exhibited racist tendencies, and that there was no real basis to think Davis was paranoid – could have concluded that Valdora and McKee wrote intentionally false memos and recommended him for psychiatric treatment in order to harass him based on race. This at least calls into question whether the District Court was correct in finding that Davis failed as a matter of law to meet the requirements of a Title VII or LAD hostile work environment claim.

However, we conclude that reversing the District Court's decision and remanding on this point would make little sense in light of the jury's factual findings in connection with Davis' retaliation claims. Although the jury did not specifically rule on hostile work environment, it did find, through the use of a special verdict sheet, that the City was not liable for race-based retaliation. The verdict sheet reflects the jury's specific findings that Davis failed to establish (1) "that the false memos written by Joseph Valdora were done for racial motives" (Pa105); and (2) "that Daniel McKee wrote intentionally false memos[.]" (Id. at 107.)

Some courts have held that jury findings given in the form of a special verdict should be given preclusive effect in subsequent proceedings involving the same underlying issues "where the jury's verdict necessarily resolves an issue in the defendant's favor." United States v. Ham, 58 F.3d 78, 85 (4th Cir. 1995); see also Schiro v. Farley, 510 U.S. 222, 233-35 (1994) (a jury's failure to fill out a verdict sheet is not given preclusive effect "unless the record establishes that the issue was actually and necessarily

_____

(E.D. Pa. 1997) (citing Andrews, 895 F.2d at 1485; Barbetta v. Chemlawn Servs. Corp., 669 F. Supp. 569, 572 (W.D.N.Y. 1987)).

37

decided in the defendant's favor."); RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1290-94 (5th Cir. 1995) (looking to the jury's special verdict sheet to determine what issues were actually litigated in a prior proceeding). We apply the reasoning of those cases here because, in deciding Davis' retaliation claims, the jury's special verdict conclusively determined the factual issues underlying Davis' hostile work environment claim in favor of the City.

The jury's conclusion that Valdora and McKee did not write intentionally false memos for racial motives was clearly determinative of the race-based retaliation claim.[18] This conclusion would also be the determinative factual issue in deciding a hostile work environment claim. Because that claim could not be based solely on evidence of racist comments, flyers, and graffiti that were not directed at Davis, it could not succeed without a finding that the defendants were racially motivated when they did act directly toward him. The jury heard all of the testimony regarding the racist comments made by Valdora and McKee and their other conduct toward Davis during meetings and

---

[18] The verdict sheet instructed the jury, "If you have answered 'No' to [questions] V1, or both V2A and B or V3 or both V4A and B, or 'No' to M1 or both M2A and B or M3 or to both M4A and B, and 'No' to G1, *you have reached your verdict*. Return to the courtroom." (Pa109) (emphasis added). The jury answered "No" to question V2A (whether Valdora was racially motivated), questions V4A and B (whether Valdora's memos were a determinative factor in the conclusions of Dr. Logue and Dr. Willard-Mack), question M1 (whether McKee wrote intentionally false memos), and question G1 (whether Deputy Chief Gauber retaliated against Davis based on his filing of an EEOC complaint).

38

morning roll call and nevertheless found that Valdora and McKee were not racially motivated.[19]

Davis has pointed to no additional evidence of surrounding circumstances that could have reasonably altered the jury's findings had it considered the hostile work environment claim. The jury would have been faced with identical evidence in deciding the identical underlying factual question, and it would therefore be futile to remand the hostile work environment claim to allow a fact-finder to make the same decision twice. A jury has already conclusively determined that the actions toward Davis were not racially motivated, and that finding is just as fatal to the hostile work environment claim as it was to the race-based retaliation claim.

In sum, assuming, *arguendo*, that the District Court erred in restricting the jury's ability to consider hostile work environment, that error would be harmless. We will therefore affirm the judgment in favor of the City on the hostile work environment claim.

---

[19] In his brief, Davis protests that the District Court erroneously instructed the jury to disregard the evidence presented of racist comments, flyers and graffiti. He claims, "the jury was being asked to decide whether Captain McKee had written false reports about Officer Davis for racial reasons but told to disregard his remarks. . . ." Brief for Appellant at 36, n.5. However, the District Court merely instructed the jury to disregard remarks "made by Trenton Police Department officers *other than Valdora and McKee*." (Pa621-22) (emphasis added). Therefore, the jury was permitted to consider the circumstances surrounding the conduct of Valdora and McKee that might tend to show that their facially neutral actions were racially motivated.

39

E.      Evidentiary Challenges

Davis contends that the District Court committed reversible error by limiting his ability to present evidence that would tend to undercut the accuracy of evaluations conducted by the City's mental health professionals.  The District Court ruled that evidence regarding whether the doctors' evaluations were correct was irrelevant to the ultimate issue of whether or not the City's actions were unlawful.

1.      *Standard of Review*

We review the District Court's decision to exclude evidence based on lack of relevance for abuse of discretion. Pfeiffer v. Marion Ctr. Area Sch. Dist., 917 F.2d 779, 781 (3d Cir. 1990).

2.      *Analysis*

As noted, the ultimate issue in this case is whether the City's adverse employment actions against Davis were racially motivated or in retaliation for Davis' protected whistle-blowing activities.  Accordingly, the District Court was correct to find that the relevant inquiry is into the employer's motivations and beliefs, not the accuracy of the mental health opinions.  In other words, the issue is not whether Davis was actually paranoid and unfit for duty, but whether the decision-makers legitimately believed that he was. Cf. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146-47 (2000) (the "ultimate question" in a Title VII case is whether the employer intentionally discriminated based on race); Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991) ("[The plaintiff's] view of his performance is not at issue; what matters is

40

the perception of the decision maker."), <u>overruled in part on other grounds</u>, <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1993).

The reliability of the mental health professionals' methods is only relevant to this case insofar as the City's psychologists allegedly relied on the Valdora and McKee memos in lieu of applying proven scientific methods. The District Court did not actually prevent Davis from submitting evidence and questioning the City's psychologists on this issue. The District Court admitted Dr. Krakoff's report (declaring Davis to be fit for duty) into evidence and permitted Dr. Whitehouse to testify on the issue of whether the Valdora and McKee memos were determinative factors in the decisions of Dr. Logue and Dr. Willard-Mack. Specifically, the jury heard testimony from Dr. Whitehouse that "There was a lot of speculation in Dr. Logue's report" and that "the only data that Dr. Logue was relying on was the fact that his, Officer Davis', supervisors had made complaints against him." (Da606-607.) As such, Davis was not denied his ability to present evidence on these relevant issues.

The court merely limited Davis' ability to present evidence that the psychologists' conclusions were otherwise rendered unreliable by faulty scientific methods. For example, Davis faults the District Court for depriving him of the opportunity to show that Dr. Willard-Mack inappropriately administered a Rorschach test. We find no abuse of discretion in limiting the evidence in this way. Had Davis shown that the Rorschach test was improperly administered, this would have no impact on the ultimate question of whether Dr. Willard-Mack's conclusions were improperly tainted by the retaliatory and discriminatory memos from Valdora and McKee.

41

F.      The District Court's Articulated Standard for the Retaliation Claims

Finally, Davis asserts that the District Court committed reversible error in adjudicating his retaliation claims by requiring him to show that discrimination was "a determinative factor" rather than applying a "substantial factor" test.[20]

1.      *Standard of Review*

Although Davis' counsel expressed his view during a sidebar conference that the "substantial factor" test was the correct one to apply in a retaliation claim, it appears that counsel did not object to the inclusion of "determinative factor" in the jury verdict sheet. Therefore, we review the court's selection of the standard for plain error. Osei-Afriyie v. Med. Coll. of Pa., 937 F.2d 876, 881 (3d Cir. 1991).

2.      *Analysis*

We find no error, let alone a plain error, in the District Court's determinative factor instruction. See Watson v. SEPTA, 207 F.3d 207, 215 (3d Cir. 2000) (applying a determinative factor

---

[20] Davis also asserts that "the District Court erred when halfway through the trial it reinstated a limited retaliation claim based on a complaint of racial harassment. . . ." Brief for Appellant at 2. However, the District Court never "reinstated" a retaliation claim. Count Sixteen of the Second Amended Complaint, which alleged continued retaliation under Title VII, the CEPA and the LAD, was alive at all times. We find nothing in the record to indicate that the District Court intended to reinstate any portion of the dismissed retaliation claims from Count Four.

analysis to a Title VII retaliation claim); <u>Donofry</u>, 795 A.2d at 271 ("To prove a CEPA claim, the plaintiff must show that the retaliatory discrimination was more likely than not *a determinative factor* in the decision." (internal quotations omitted) (emphasis added)).

IV.

For the foregoing reasons, we affirm the District Court in all respects, including its orders of September 28, 2001 (granting partial summary judgment in favor of the City), October 20, 2003 (denying Davis' Motion to Amend the Final Pretrial Order), February 12, 2004 (denying Davis' Motion to Vacate the September 28, 2001, summary judgment order), and March 25, 2004 (entering judgment on the jury's verdict in favor of the City).