**Tragi CANNON, Plaintiff,**

v.

**CORRECTIONAL MEDICAL SERVICES, Defendant.**

**Civ. No. 08–911–SLR.**

United States District Court, D. Delaware.

July 26, 2010.

---

Garvan F. McDaniel, Esquire of Bifferato Gentilotti LLC, Wilmington, DE. for Plaintiff. Of Counsel: Michael J. Needleman, Esquire of Chartwell Law Offices, LLP, Philadelphia, PA.

Victoria Guilfoyle, Esquire of Blank Rome LLP, Wilmington, DE, for Defendant. Of Counsel: Brooke T. Iley, Esquire and Harrison Lee, Esquire of Blank Rome LLP, Washington, DC.

## MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

### I. INTRODUCTION

On December 5, 2008, plaintiff Traci Cannon ("plaintiff") filed a complaint against defendant Correctional Medical Services ("CMS"), alleging racial discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"). (D.I. 1)

Plaintiff seeks, inter alia, front and back pay, punitive and compensatory damages, interest and attorney fees. (*Id.* at 5) The court has jurisdiction over plaintiff's claims pursuant to 42 U.S.C. § 2000e and 28 U.S.C. § 1331. Currently before the court is CMS' motion for summary judgment·on all of plaintiff's claims. (D.I. 35) For the following reasons, the motion is granted.

## II. BACKGROUND

CMS provides healthcare services to correctional institutions through contracts with state, county, and municipal governments, (D.I. 37, Tab 18 at 17:21–24) Plaintiff, an African–American woman, was hired by CMS as Director of Nursing ("DON") on July 3, 2007. (D.I. 1 at 2) Plaintiff's assignment was under the supervision of Norene Greenleaf ("Greenleaf"), the Health Services Administrator ("HSA") at Baylor Women's Correctional Institute ("Baylor"). (*Id.*) Greenleaf initially interviewed plaintiff for the DON

position, and Regional Vice President Nancy Elmer ("Elmer") subsequently offered plaintiff the position. (D.I. 37, Tab 20 at 76:17–77:8, 79:6–8) Among plaintiff's responsibilities as DON were scheduling, meeting staff needs, and supervising the nursing staff. (D.I. 1 at 2) Plaintiff's last day of employment at Baylor was December 21, 2007. (*Id.* at 5)

Under CMS policy, plaintiff was required to be licensed in the State of Delaware, which required her to obtain a temporary permit from the State of Delaware's Board of Nursing ("Board of Nursing"). (D.I. 37, Tab 7; Tab 24 at 3) After receiving a 90–day temporary permit from the Board of Nursing, plaintiff assumed her position as DON at Baylor. (*Id.*, Tab 9) At that point, plaintiff received a copy of CMS's Employee Success Guide, which contained its Harassment Policy,[1] Equal Employment Opportunity Policy,[2] and its Corrective Action Policy.[3] (*Id.*, Tab 3; Tab

---

1. The Harassment Policy states, in pertinent part:

 CMS is committed to providing a work environment that is free of discrimination or harassment. In keeping with this commitment, no form of harassment, sexual or otherwise, will be tolerated in the work place. Any employee who feels that a supervisor's, manager's, other employee's or non-employee's actions, words or conduct constitutes harassment is required to report the incident immediately.
 CMS prohibits not only harassment but also any type of retaliation for making a harassment complaint, for assisting another to make a harassment complaint, or for participating in a harassment investigation. All CMS employees, particularly Supervisors and Managers, have a responsibility for keeping the work environment free of harassment or retaliation of any type. Any employee, who becomes aware of an incident of harassment, whether by witnessing the incident or being told of it by others, must report the incident as soon as possible.
 (D.I. 37, Tab 1)

2. The Equal Employment Opportunity Policy states, in pertinent part:

 It is the policy of CMS to provide equal opportunity and employment to all. CMS is fully committed to the challenge and opportunity to be an equal opportunity employer. We will make all decisions to recruit, select, train, transfer, promote and release employees without regard to age, race, gender, sexual orientation, religion, national origin.... 
 (*Id.*)

3. The Corrective Action Policy states, in pertinent part:

 An employee may receive a final written warning or be recommended for termination due to serious misconduct. Examples of misconduct and reasons considered justification for termination and/or immediate action include, but are not limited to ... [r]efusing or deliberately failing to carry out a reasonable instruction of your Supervisor ... [and] [v]iolation of federal, state, or local laws and regulations.... 
 (*Id.*)

4; Tab 20 at 82:20–84:9) Additionally, plaintiff participated in training on CMS policies and corporate compliance. (*Id.*, Tab 5)

Sometime in July 2007, plaintiff contacted Elmer with complaints that Greenleaf was treating Caucasian employees more favorably than African–American employees.[4] (D.I. 42, Tab A at 91:1–22) The subject of the complaints included an incident occurring shortly after plaintiff began her employment at Baylor in which plaintiff received a complaint that a Caucasian nurse named "Janice Gebhart–Brown [ ("Gebhart–Brown") ] came into the breakroom and said, '[b]oy, it sure is a lot of y'all here.' " (D.I. 37, Tab 20 at 88:2–23). Plaintiff then reported the incident to Greenleaf. (*Id.*) Further, plaintiff complained that when she attempted to discipline three employees for failing to complete medication orders for inmate patients, Greenleaf only wanted to discipline the African–American employees, Michelle Flowers and Kim Ortiz, and not Gebhart–Brown. (*Id.* at 89:24–90:9) In addition, plaintiff claims that Greenleaf would not allow her to grant vacation days for an African–American nurse named Sharon Brown due to excessive absences, while plaintiff was also not allowed to reprimand Gebhart–Brown for the same infraction. (*Id.* at 90:12–22)

In August 2007, a verbal altercation between Gebhart–Brown and an African–American nurse, Letitia Robinson ("Robinson"), did not result in discipline for Gebhart–Brown. (*Id.* at 23:21–24:7) Plaintiff notified Greenleaf of the incident, who, according to plaintiff, "hoped it would go away." (*Id.*) Plaintiff then forwarded to Regional Director of Nursing Linda Gogola ("Gogola") and Regional Manager Janna Dinkel ("Dinkel") witness statements regarding the altercation between Gebhart–Brown and Robinson.[5] (*Id.*) Plaintiff asked that Gogola and Dinkel come out to investigate the situation. (*Id.* at 93:19–94:23) Although Gogola and Dinkel came to the site, no investigation or discipline of Gebhart–Brown resulted. (*Id.*)

Later in August 2007, plaintiff urged Greenleaf to make Letitia Brown ("Brown") a full-time employee to fill an open position, (*Id.* at 37:9–38:21) According to plaintiff, Greenleaf refused because she thought Brown was lazy, and instead hired a nurse who had only been on staff for a few weeks. (*Id.*) Similarly, Greenleaf denied plaintiff's suggestion to hire another African–American nurse full-time because Greenleaf felt that she was "loud and obnoxious." (*Id.* at 95:24–96:11) Plaintiff then complained to Dinkel and Gogola about her hiring conflicts with Greenleaf. (*Id.* at 97:5–6)

At around this time, plaintiff confronted CMS's Area Human Resources Director, Sterling Price ("Price"), about her issues with Greenleaf at a training session in Delaware.[6] (*Id.*, Tab 18 at 25:11–15) Plaintiff told Price that she was having a difficult time dealing with Greenleaf and that recurring conflicts over management of the Baylor site existed. (*Id.*) Price advised plaintiff that Greenleaf's personality style was more amenable to a less aggressive approach on the part of plaintiff. (*Id.* at 26:3–9)

In October 2007, Gebhart–Brown was involved in an incident where she balled up an assignment sheet listing the nurses' duties and schedules which plaintiff had

---

4. Plaintiff's alleged complaints are not of record.

5. These statements are not of record.

6. In his affidavit, Price avers that plaintiff "did not mention race, complain about race, or imply that the issues she was having with Norene Greenleaf were in any way related to race." (*Id.*, Tab 21 at 2, ¶ 4)

posted. (*Id.,* Tab 20 at 31:10–32:21) In the presence of plaintiff and Greenleaf, Gebhart–Brown, a subordinate nurse-employee, destroyed the assignment sheet and entered into an argument with plaintiff. (*Id.*) Plaintiff accused Gebhart–Brown of insubordination; Greenleaf issued written discipline to Gebhart–Brown on October 24, 2007. (*Id.,* Tab 8) Plaintiff was not disciplined as a result of the altercation. (*Id.,* Tab 20 at 32:23–24)

On or around October 14, 2007, plaintiff was nearly written up for refusing to attend a week-long training session in St. Louis, Missouri. (*Id.* at 101:15–22) Greenleaf attempted to impose discipline for insubordination despite the fact that plaintiff had arranged with Training Coordinator Lynn Davis to reschedule training for December of 2007. (*Id.*) Plaintiff cleared up the situation by providing a statement to Dinkel regarding the arrangements she had made previously. (*Id.*)

On several occasions, Greenleaf exercised her authority over plaintiff with respect to scheduling nurses' shifts. (*Id.,* Tab 20 at 29:1–31:4, 97:14–100:15) One such instance occurred in October 2007, when plaintiff refused to mandate [7] an African American nurse named April Bungy ("Bungy") to stay on-site in order to cover a shift. (*Id.* at 29:1–23) Although the two-nurse minimum policy was fulfilled for this particular shift,[8] Greenleaf ordered plaintiff to mandate Bungy to stay. (*Id.*) When plaintiff refused to mandate Bungy to stay, CMS did not issue discipline to plaintiff. (*Id.* at 32:22–24) Plaintiff called Elmer to complain about the scheduling dispute with Greenleaf. (*Id.* at 100:19–21) Another instance involved Greenleaf's insistence that plaintiff mandate an African–American nurse to stay and work alone, while Gebhart–Brown was allowed to go home. (*Id.* at 29:24–30:10) Greenleaf's decision to allow Gebhart–Brown to leave superseded plaintiff's authority. (*Id.*)

Around the middle of October 2007, CMS conducted a meeting at Gander Hill Prison in Wilmington, Delaware with plaintiff, Greenleaf, Regional Vice President Chad Barr ("Barr"), Gogola, and Dinkel, during which plaintiff discussed her opinion that Greenleaf constantly undermined her authority. (*Id.* at 107:18–108:22) In addition, plaintiff claims that she raised prior complaints of discrimination to those in attendance.[9] (*Id.*) Barr responded that he thought the conflict involved a "power play" and proceeded to clarify each party's role. (*Id.* at 109:3–9) Plaintiff alleges that, at one point in the meeting, Barr offended her by calling her "girlfriend," to which she replied, "I'm not your girlfriend. I'm your employee." [10] (*Id.* at 39:24–40:7) During the meeting, Greenleaf was emotional and declared her intention to resign, however, Barr would not accept her resignation. (*Id.* at 109:3–110:3) No discipline issued as a result of

---

**7.** According to plaintiff, "mandating" required plaintiff to force a nurse who had already worked a shift to work a complete second shift when the site was short staffed. (*Id.,* Tab 20 at 98:3–99:7)

**8.** As mentioned above, plaintiff emphasizes that she was in charge of staffing. Plaintiff and Greenleaf agreed that no fewer than two nurses could cover any shift. (*Id.*)

**9.** Plaintiff provides no support for this assertion, and does not mention having complained about discrimination at the meeting

in her deposition testimony. (*Id.,* Tab 20 at 108:14–109:16) Gogola, who was in attendance at the Gander Hill meeting, averred in her affidavit that plaintiff "did not mention differential treatment on the basis of her race, complain about race, or otherwise imply that she was being discriminated against on the basis of her race." (*Id.,* Tab 22 at 2, ¶ 5)

**10.** Gogola further avers in her affidavit that she does not remember Barr having called plaintiff "girlfriend." In addition, Gogola points out that Barr is married to an African–American woman. (*Id.,* Tab 22 at 2, ¶ 6)

this meeting. (*Id.*) Afterwards, Greenleaf calmed down and apologized to plaintiff. (*Id.*)

Towards the end of October 2007, CMS management reviewed the personnel files of all nurses to ensure that nursing licenses were current in preparation for an upcoming Department of Justice audit. (*Id.*, Tab 19 at 80:1–6) During this audit, it was discovered that Kimya Spence ("Spence"), Will Allen ("Allen"), and plaintiff did not possess valid nursing licenses. (*Id.* at 80:16–81:3) Both Spence and Allen were African–American nurses. (*Id.* at 81:10–15) Spence worked at Baylor, whereas Allen worked at Howard Young Correctional Institute. (*Id.*) Plaintiff's temporary nursing permit had expired as of October 3, 2007. (*Id.*, Tab 9)

At the end of October 2007, plaintiff was informed of the expiration of her temporary permit. (*Id.*, Tab 20 at 39:7–20) According to plaintiff, Gogola called Greenleaf, and Greenleaf relayed the message to plaintiff and Spence on October 30, 2007. (*Id.*) CMS maintains that Gogola directly contacted plaintiff on or about October 24, 2007. (*Id.*, Tab 10; Tab 11; Tab 19 at 78:24–79:6; Tab 22 at 2, ¶ 7) Allen and Spence immediately contacted the Board of Nursing to renew their licenses. (*Id.*, Tab 19 at 81:19–82:4) Thereafter, plaintiff claims that she immediately contacted the Board of Nursing and advised Gogola of her intention to apply for a new temporary permit. (*Id.*, Tab 20 at 104:14–105:6) The Board of Nursing advised plaintiff that it had not approved her license and that she should reapply for another temporary license. (*Id.*)

Following Gogola's initial call to plaintiff regarding the expiration of her permit, Gogola called plaintiff to inquire about her status in procuring a new permit. (*Id.*, Tab 19 at 82:9–19) Plaintiff responded that she had submitted all of her documents to the Board of Nursing. (*Id.*) It is unclear when exactly plaintiff applied for a new temporary permit; however, on December 13, 2007, plaintiff filed a Voluntary Reporting Form to the Board of Nursing acknowledging the period between October 5, 2007 and December 12, 2007 in which she worked without a license or temporary permit. (*Id.*, Tab 12)

On December 7, 2007, Dinkel contacted plaintiff regarding Greenleaf's resignation effective December 12, 2007, and that plaintiff would fill in as acting HSA until a replacement was found. (*Id.*, Tab 20 at 112:7–13) The HSA position did not require a license because it did not involve nursing duties. (*Id.*, Tab 20 at 114:9–10) Nevertheless, Greenleaf had previously instructed plaintiff not to perform nursing duties in her capacity as DON. (*Id.*, Tab 11) Plaintiff received a call from Dinkel and Gogola on December 14, 2007, informing plaintiff that she was re-classified as a medical records clerk until a temporary permit was issued. (*Id.*, Tab 20 at 112:22–113:18) Plaintiff complained that the classification involved a pay reduction to fifteen dollars per hour though she was still doing the same work. (*Id.*)

Due to concerns about nursing licenses at Baylor, David Mangler ("Mangler"), Executive Director of the Board of Nursing, called Gogola. (*Id.*, Tab 19 at 57:10–58:18) On December 17, 2007, plaintiff received a letter from Mangler advising plaintiff of Delaware's laws regarding the licensing of nurses, and informed her that her violation was under investigation. (*Id.*, Tab 13) The letter also warned plaintiff that further practice without a license could result in disciplinary action. (*Id.*)

On December 20, 2007, Gogola met with Mangler at CMS' office in Delaware. (*Id.*, Tab 10) Mangler told Gogola that the Board of Nursing would not issue a permit to plaintiff and gave Gogola a verbal list of Baylor employees who were practicing

without a license. (*Id.*, Tab 19 at 59:13–60:7) Mangler also informed Gogola that plaintiff was under investigation, and that the investigation would delay any permit issuance in the near future. (*Id.*) Gogola does not have a copy of the list, nor did she tell anyone else at CMS about her in-person meeting with Mangler. (*Id.*)

Thereafter, Gogola contacted Price and advised him that plaintiff was under investigation and that a temporary permit would not issue. (*Id.*, Tab 18 at 36:4–6) Upon hearing this information, Price decided that plaintiff's opportunity to obtain a valid license had lapsed. (D.I. 43, Ex. A) Because it was the responsibility of each nurse to maintain a valid license in the State of Delaware, and failure to do so was a terminable offense, Price recommended plaintiff's termination on December 20, 2007.[11] (D.I. 37, Tab 21 at 2, ¶ 6)

Plaintiff was terminated from CMS on December 21, 2007. (D.I. 42, Tab A at 56:14–16) On that day, Gogola and Dinkel traveled to Baylor and informed plaintiff of Price and Dinkel's decision to terminate her employment. (D.I. 37, Tab 19 at 71:20–73:1) Plaintiff was told that the only reason for her termination was for lack of a valid license in Delaware. (*Id.*, Tab 20 at 131:3–6) Plaintiff requested a leave of absence in her meeting with Gogola and Dinkel, but she was not eligible under CMS policy. (*Id.*, Tab 14; Tab 20 at 128:10–129:5) At 2:15 p.m. that day, plaintiff sent an e-mail to Mangler acknowledging receipt of his letter on December 17, 2007 and requesting a hearing. (*Id.*, Tab 14) Within the hour, Mangler sent a reply e-mail informing plaintiff that a hearing was not necessary and that the Board of Nursing was not going to take action against her. (*Id.*) After plaintiff's reply detailing the issues she was having with her employer,[12] Mangler finally replied that the Board of Nursing was a separate body, and that plaintiff should call him directly. (*Id.*)

Plaintiff called Mangler on December 31, 2007. (*Id.*, Tab 20 at 130:5–131:2) Mangler advised plaintiff that the Board of Nursing would issue her a temporary permit if she could verify that she had employment or an offer of employment. (*Id.*) On January 2, 2008, Gogola contacted Mangler at plaintiff's request. (*Id.*, Tab 15) Mangler informed Gogola of the Board of Nursing's willingness to issue plaintiff a temporary permit if it could verify plaintiff's employment status. (*Id.*) On January 3, 2008, plaintiff sent an e-mail to Mangler asking him if he had spoken to anyone at CMS about plaintiff's temporary permit. (*Id.*) Mangler replied that he had spoken to Gogola about the possibility of verifying plaintiff's employment, but not Dinkel. (*Id.*) After hearing from Mangler, plaintiff claims that she forwarded Mangler's re-

11. In a December 20, 2007 memo from Price to Dinkel, Price wrote:

> [Plaintiff's] temporary permit to practice nursing in the State of Delaware expired October 4, 2007, and she is unable to reinstate her temporary permit at this time. Since her job requires her to be licensed in the State of Delaware as a Registered Nurse, I am recommending her termination.

(D.I. 43, Ex. A)

12. Plaintiff's e-mail, dated December 21, 2007 at 3:31 p.m., states, in pertinent part:

> Mr. Mangler,

> Please understand that I am very confused, and it was never my intention to practice without a license ... [T]he thing that angers me the most is that I have worked 10–16 hour days for this company and even quit[ ] my weekend job to [troubleshoot] for them ... and **although it is ultimately my responsibility** aren't they supposed to keep their employees notified of things like this[?] There were several other nurses that were employed by this company from other sites that were from out of state that fell in to the same trap.

(D.I. 37, Tab 14) (emphasis added)

sponse e-mail to Gogola and Dinkel, and that neither verified plaintiff's employment with Mangler or contacted plaintiff to resolve her licensing issues. (*Id.*, Tab 20 at 131:14–133:11) CMS contends that plaintiff did not contact Gogola or any member of management to give updates on the status of her license or to reapply for a position. (*Id.*, Tab 21 at 2, ¶ 7; Tab 22 at 3, ¶ 17) Plaintiff ultimately received her Delaware permanent license on January 9, 2008. (*Id.*, Tab 20 at 131:19–132:4) At that point, CMS claims that plaintiff ceased contact, (*Id.*, Tab 19 at 83:21–23; Tab 20 at 132:5–14; Tab 21 at 2, ¶ 7; Tab 22 at 3, ¶ 17); however, plaintiff alleges that she sent her new license to Price. (*Id.*, Tab 20 at 134:16–20) Plaintiff never reapplied for a position at CMS. (*Id.*, Tab 20 at 132:5–14)

On or about January 30, 2008, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she was discriminated against on the basis of her race and retaliated against for making complaints to CMS management. (D.I. 1) On or about September 9, 2008, the EEOC dismissed plaintiff's Charge of Discrimination and issued her a Notice of Right to Sue, finding that based on the information provided, it could not conclude that CMS violated Title VII. (D.I. 1–4) On December 5, 2008, plaintiff commenced this lawsuit. (*Id.*)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). With respect to summary judgment in discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Revis v. Slocomb Indus.*, 814 F.Supp. 1209, 1215 (D.Del. 1993) (quoting *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir.1987)).

## IV. DISCUSSION

 "The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." [13] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 429, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)) (hereinafter, "*McDonnell Douglas*"). Further, "[t]he broad, overriding interest, shared by employer, employee, and consumer, is efficient and trustworthy workmanship assured through fair and racially neutral employment and personnel decisions. In the implementation of such decisions, it is abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise." *Id.* at 801, 93 S.Ct. 1817. On the other hand, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions' of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Moreover, Title VII "does not set forth a general civility code for the American workplace," *Burlington Northern and Santa Fe Railway Company v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), nor is it "designed to purge the workplace of vulgarity," *Baskerville v. Culligan International Company*, 50 F.3d 428, 430 (7th Cir.1995).

Amidst this background, the court must determine whether plaintiff has evidence of a genuine issue of material fact with respect to her claims of racial discrimination, hostile work environment, and retaliation. The court finds that plaintiff has not carried this burden and, therefore, grants CMS' motion for summary judgment on all counts.

### A. Racial Discrimination

Discrimination claims under Title VII are analyzed under the burden-shifting framework set forth by the United States Supreme Court in *McDonnell Douglas*. A plaintiff must first present a prima facie case of discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action despite being qualified; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir.2003). An adverse employment action "may be ... any action that alters an employee's compensation, terms, conditions, or privileges of employment." *Collins v. Sload*, 212 Fed.Appx. 136, 140 (3d Cir.2007) (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir.1997)). Once the plaintiff has established a prima facie case of racial discrimination, "the burden shifts to the [employer] 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir.1999)

13. The anti-discrimination provision of Title VII provides:

> It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

(quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817). "Finally, should the [employer] carry this burden, the plaintiff then must have an opportunity to prove by preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ It is undisputed that plaintiff, as an African–American, is a member of a protected class and that she is qualified for the DON position at Baylor. In addition, CMS concedes that plaintiff's termination constitutes an adverse employment action.[14] (D.I. 36 at 17 n. 3) CMS also took adverse action against plaintiff by demoting her to medical records clerk on December 14, 2007 and reducing her pay to $15 per hour. A demotion of title, duties, and pay amount to changes in the terms and conditions of employment. *See Collins*, 212 Fed.Appx. at 140. CMS argues that plaintiff has not set forth any evidence to give rise to an inference of unlawful discrimination. The court agrees that plaintiff cannot make a prima facie case of racial discrimination.

■ In order to survive a motion for summary judgment, plaintiff must provide some evidence of racial discrimination surrounding her termination. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Plaintiff's only evidence consists of her deposition testimony which, in itself, is mere speculation. Discovery has closed. Plaintiff cannot rely on her uncorroborated and speculative deposition testimony regarding the circumstances surrounding her demotion and termination as the sole support for her claim. *See*, e.g., *Jones*, 198 F.3d at 414 (deeming unsupported allegations of discrimination based solely on plaintiff's personal beliefs to be irrelevant); *Longmire v. Wyser–Pratte*, Civ. No. 05–6725, 2007 WL 2584662, at *11 (S.D.N.Y. Sept. 6, 2007) (granting summary judgment on Title VII claim against plaintiff, who "relie[d] exclusively on his own conclusory allegations-which [were] wholly and uniformly uncorroborated"). Absent additional evidence, no reasonable jury could find that plaintiff was unlawfully demoted or terminated based on her race.

■ Notwithstanding, plaintiff has not proffered any evidence that other comparators were treated more favorably based on their race. "The central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their race...." *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 798 (3d Cir.2003); *see also Subh v. Wal–Mart Stores East, LP*, Civ. No. 07–479, 2009 WL 866798, at *14 (D.Del. Mar. 31, 2009) ("*McDonnell Douglas* teaches that it is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.") (quoting *Burdine*, 450 U.S. at 258–59, 101 S.Ct. 1089). Although plaintiff alleges several instances in which Caucasian employees were treated differently than African–

---

14. No adverse action exists to the extent that plaintiff claims Greenleaf frustrated plaintiff's ability to perform the duties of her employment by forcing her to mandate Bungy to work an extra shift (D.I. 37, Tab 20 at 29:1–31:4, 97:14–100:15), refusing to hire Brown and another African–American nurse for full-time positions (*Id.* at 37:9–38:21, 95:24– 96:11), attempting to impose discipline on plaintiff (*Id.* at 101:15–22), and refusing to discipline Gebhart–Brown and other Caucasian nurses (*Id.* at 89:24–90:9, 90:12–22, 23:21–24:7). Under CMS' organizational structure, plaintiff was required to submit to the HSA's authority. (*See* D.I. 37, Tab 2)

American employees, *supra* note 15, plaintiff has not identified a single similarly situated nurse outside of plaintiff's race who was spared adverse action by CMS despite working with an expired license.[15] *See Houston v. Easton Area Sch. Dist.*, 355 Fed.Appx. 651, 654 (3d Cir.2009) ("To make a comparison of the plaintiff's treatment to that of an employee outside the plaintiff's protected class for purposes of a Title VII claim, the plaintiff must show that [she] and the employee are similarly situated in all relevant respects."). Even assuming that Gebhart–Brown is a valid comparator, the record is clear that Gebhart–Brown was issued verbal counseling following the incident in which Gebhart–Brown balled up plaintiff's assignment sheet, whereas plaintiff was never issued discipline by CMS at any time during her employment. Moreover, two African–American nurses who worked with expired nursing licenses during plaintiff's employment, Will Allen and Kimya Spence, promptly remedied their licensing issues and, therefore, they were not terminated or disciplined in any way. On this record, plaintiff cannot establish that she was treated less favorably than similarly situated CMS employees.

Finally, CMS argues that Greenleaf actually hired plaintiff and, therefore, is presumed to have made decisions towards plaintiff without regard to race. *See Williams–McCoy v. Starz Encore Grp.*, Civ. No. 02–5125, 2004 WL 356198, at *31 n. 21 (E.D.Pa. Feb. 5, 2004) (finding that racially biased individual would presumably not hire African–American in the first place). It is unclear from the record whether plaintiff was hired by Greenleaf or Elmer. Viewing this factual dispute in the favor of plaintiff, the presumption is inapplicable. Notwithstanding, Greenleaf was not involved with plaintiff's demotion or termination Greenleaf resigned on December 12, 2007—over a week before plaintiff's employment was terminated. According to plaintiff, the only decision-makers involved in plaintiff's termination were Dinkel and Price, neither of whom are the subject of any of plaintiff's allegations of discrimination. *See Fuentes v. Perskie*, 32 F.3d 759, 766–67 (3d Cir.1994) (requiring plaintiff to demonstrate discrimination by those imposing the adverse employment action).

Based on the foregoing, the court need not engage in an extensive burden shifting analysis because plaintiff has not presented facts sufficient to state a prima facie case on any of her Title VII claims. CMS' motion for summary judgment is granted as to this count.

## B. Hostile Work Environment

■■■ To establish a Title VII claim of discrimination based on a hostile work environment, plaintiff must make a showing of "the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1485 (3d Cir.1990). Plaintiff must establish a prima facie case by demonstrating that: "(1) [she] suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive;[16] (3) the discrimination detrimentally affected [her]; (4)

---

**15.** Plaintiff's deposition testimony states, in pertinent part:

> Q. [Paragraph 13(g) of the Complaint] states ... Greenleaf routinely overlooked temporary nursing certifications held by Caucasian employees while requiring

[plaintiff] to obtain a permanent nursing certification.
A. I have no idea what that—I have no idea what that one is about. I don't remember that.
(*Id.*, Tab 20 at 38:23–39:6)

**16.** The use of the "severe or pervasive" stan-

the discrimination would detrimentally affect a reasonable African–American person in that position; and (5) the defendant is liable under a theory of respondeat superior." *Id.* at 1482–83. "A prima facie showing, therefore, contains both a subjective standard (that plaintiff was in fact affected) and an objective standard (that a reasonable, similarly situated African–American would be affected)." *Id.* If plaintiff fails on essential elements of her claim, then the court need not decide the other elements. *See Arasteh v. MBNA America Bank, N.A.,* 146 F.Supp.2d 476, 493 (D.Del.2001) (granting summary judgment for defendant where plaintiff failed to meet her burden on two essential elements of her claim).

■■■ The Supreme Court has stated that determining whether a hostile work environment claim lies "cannot be[ ] a mathematically precise process." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Rather, courts must look to the totality of the circumstances to evaluate a work environment. Such circumstances may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* "The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Id.*

■■ Plaintiff argues that she was subjected to intentional racial discrimination arising out of conflicts with Greenleaf involving the scheduling and hiring of nurses and Greenleaf's failure to act in response to plaintiff's complaints. Plaintiff is required to demonstrate that race played a substantial role in the harassment and that she would have been treated more favorably had she been Caucasian. *See Andrews,* 895 F.2d at 1485. Plaintiff has failed to do so. Plaintiff's verbal altercations with Gebhart–Brown did not implicate race. There is no indication that Greenleaf's orders that plaintiff mandate Bungy while Gebhart–Brown was allowed to leave, and Greenleaf's refusal to hire Brown for a full-time position, were decisions outside of CMS policy. Plaintiff provides no evidence to show that a Caucasian DON would have faced different requirements. Plaintiff relies solely on her subjective belief that Greenleaf acted (or failed to act) due to racial animus. *Jones,* 198 F.3d at 414.

Furthermore, the record indicates that plaintiff's conflicts with Greenleaf arose out of differences in management style, not race. *See Gomez v. Allegheny Health Services, Inc.,* 71 F.3d 1079, 1085–86 (3d Cir.1995) (finding that Colombian surgeon was not fired due to national origin, but because of poor surgical performance); *Mitchell v. Wachovia Corp.,* 556 F.Supp.2d 336, 350 (D.Del.2008) (reasoning that differential treatment was not linked to race, but rather was result of "interpersonal discord based on personal dislike"). Plaintiff's own testimony shows that she did not indicate race was a factor in her complaints about Greenleaf.[17] Price's testimo-

dard has most recently been affirmed by the Supreme Court in *Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 270, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001).

17. When asked about what she brought up at the Gander Hill meeting in mid-October 2007, plaintiff stated:

A. I cited all these previous issues. I cited the fact that [Greenleaf] continually undermined me with the employees concerning two of the people that she was friends with. I stated that—just the fact that [Greenleaf] just would not allow me to do what I was

ny corroborates this fact by characterizing plaintiff's issues with Greenleaf as a mere communication failure involving diverging management styles. (D.I. 37, Tab 18 at 26:3–9)

Plaintiff also alleges that two racially discriminatory comments were made by CMS employees. Specifically, plaintiff claims that Gebhart–Brown commented to Spence in the breakroom at Baylor that, "[b]oy, it sure is a lot of y'all here" in July 2007 (*Id.*, Tab 20 at 88:2–23), and that Barr called plaintiff "girlfriend" at the Gander Hill Meeting in October 2007. (*Id.* at 39:24–40:7) Neither comment is corroborated by evidence outside of plaintiff's own testimony. *See Shramban v. Aetna,* 262 F.Supp.2d 531, 536 (E.D.Pa.2003) (holding that plaintiff failed to produce enough evidence beyond her allegations and deposition testimony to create a sufficient issue of fact to be resolved by a jury), *aff'd,* 115 Fed.Appx. 578 (3d Cir.2004). Without any record evidence to support her claims, indirect or otherwise, plaintiff fails to meet her burden of establishing discrimination based on race.

Even if plaintiff succeeded in creating a genuine issue of material fact that the complained of conduct was racially motivated, such conduct was not severe or pervasive. Even viewing the facts in the light most favorable to the plaintiff, the totality of the circumstances is far from extreme. *Caver v. City of Trenton,* 420 F.3d 243, 262 (3d Cir.2005) (allegedly offensive conduct must be "extreme" and constitute "change in the terms and conditions of employment"). The atmosphere in

which plaintiff worked may have been uncomfortable at times (*see, e.g.,* D.I. 37, Tab 20 at 32:1–21), but the stresses of plaintiff's workplace do not rise to the level of a Title VII violation. Despite her frustration with Greenleaf's imposition of authority and the offense she took when Barr allegedly called her "girlfriend," such conduct amounts to the sort of " 'offhanded comments and isolated incidents' that . . . should not be considered severe or pervasive enough to constitute a hostile work environment." *Caver,* 420 F.3d at 263. When considering the "overall scenario," plaintiff dealt with infrequent and mildly offensive conduct spread over a period of four months. *Id.* at 262. No reasonable jury could find that such conduct was severe or pervasive.

Having found that plaintiff failed to create a genuine issue of material fact on two essential elements of her prima facie case of hostile work environment, the court will not address the remaining elements of the claim. Accordingly, summary judgment is granted for CMS on this count.

### C. Retaliation

■■■■ To establish a prima facie case of retaliation under Title VII, plaintiff must demonstrate that: "(1) [she] engaged in activity protected by Title VII; (2) [CMS] took an adverse employment action against [her]; and (3) there was a causal connection between [her] participation in the protected activity and the adverse employment action." [18] *Moore v. City of Philadelphia,* 461 F.3d 331, 340–41 (3d Cir.2006) (citing *Nelson v. Upsala Coll.,* 51

hired to do and she kept undermining the whole situation.
(D.I. 37, Tab 20 at 108:16–22)

**18.** 42 U.S.C.A. § 2000e–3 provides:

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings.

It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

F.3d 383, 386 (3d Cir.1995)). If plaintiff establishes a prima facie case of retaliation, the burden shifts to CMS to advance a legitimate, non-retaliatory reason for its adverse employment action. "The employer's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate [reason] for the adverse employment action; the defendant need not prove that the articulated reason actually motivated the action." *Miller v. Delaware Probation and Parole*, 41 Fed.Appx. 581, 584 (3d Cir.2002) (internal quotation marks and citations omitted). "If the employer satisfies its burden, the plaintiff must be able to convince the fact finder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* "The plaintiff must prove that retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of that process. The burden of proof remains at all times with the plaintiff." *Id.* As discussed above, plaintiff has established that the demotion and termination of her employment constitute adverse employment actions.

 Plaintiff argues that she engaged in protected activity on several occasions by complaining about race discrimination to CMS management.[19] "Opposition" to discrimination can take the form of "informal protests of discriminatory employment practices, including making complaints to management." *Moore*, 461 F.3d at 343 (quoting *Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir.2006)). To determine if retaliation plaintiffs sufficiently "opposed" discrimination, "[the court] look[s] to the mes-

sage being conveyed rather than the means of conveyance." *Id.*

 In order to establish that she opposed discrimination, plaintiff points to: (1) phone calls in July 2007 to Nancy Elmer; (2) a site visit by Dinkel and Gogola in August 2007; (3) a conversation with Price in the summer of 2007; and (4) a meeting with Barr, Greenleaf, Gogola and Dinkel in October 2007. In order to engage in protected activity under Title VII, plaintiff must have opposed discrimination **on the basis of race**. *See Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701 (3d Cir. 1995) (finding that Age Discrimination in Employment Act is analogous to Title VII and "protected conduct" requires opposition to discrimination based on age). Plaintiff alleges that she brought up the issue of race in each of her complaints, but Price and Gogola contend that plaintiff never brought up discrimination to any member of CMS management. (D.I. 37, Tab 21 at 2, ¶ 8; Tab 22 at 3, ¶ 20) The only evidence of record comprises a complaint to Dinkel on October 14, 2007 and an October 24, 2007 note about Greenleaf forcing plaintiff to mandate nurses. (*Id.*, Tab 16; Tab 17) Neither contains any allegations of racial animus. There is no indication that plaintiff mentioned race in her alleged complaints to Elmer, Price, or during the October 2007 meeting with CMS management. The remaining complaint occurred when Dinkel and Gogola visited Baylor in August 2007 and concerned the incident when Gebhart–Brown balled up plaintiff's assignment sheet. There is no evidence that plaintiff brought up race to Dinkel and Gogola at this point. In fact, plaintiff testified that Robinson made the complaint after plaintiff had left the room. (*Id.*, Tab 20 at 94:15–95:1)

---

**19.** Plaintiff's filing with the EEOC on January 30, 2008 constitutes protected activity under Title VII. *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989). The EEOC filing does not predate either of the adverse employment actions alleged by plaintiff and, therefore, does not support plaintiff's prima facie case.

Plaintiff has no evidence to substantiate her claims that she opposed any employment practice made unlawful by Title VII.

 Further, there is nothing "unusually suggestive" about the time-frame from her complaints leading up to her demotion and termination to suggest a causal link. *See Marra v. Philadelphia Hous. Auth.,* 497 F.3d 286, 302 (3d Cir.2007). Even if plaintiff made a prima facie case, CMS articulated legitimate, non-discriminatory reasons for the adverse employment actions: mainly, plaintiff failed to timely obtain her required nursing license. Plaintiff has put forth nothing to rebut this and, therefore, no reasonable jury could find in her favor.

## V. CONCLUSION

For the above reasons, the court grants the motion for summary judgment filed by CMS on all counts.[20] (D.I. 35) An appropriate order shall issue.

### ORDER

At Wilmington this 26th day of July, 2010, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. The motion for summary judgment filed by defendant Correctional Medical Services is granted. (D.I. 35)

2. The Clerk of Court shall enter judgment in favor of said defendant and against plaintiff.

---

20. Because the court grants summary judgment in favor of CMS on all counts, its motion to compel (D.I. 38) and plaintiff's motion for leave to file surreply (D.I. 44) are moot.