NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-4690
_____

JENEKA PEACE-WICKHAM
                                              Appellant

v.

JAMES WALLS, in his individual capacity,
DELAWARE RIVER & BAY AUTHORITY
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 07-cv-598)
Magistrate Judge: Hon. Mary Pat Thynge
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 17, 2010

Before: JORDAN, HARDIMAN, and VAN ANTWERPEN, *Circuit Judges*.

(Filed: December 21, 2010)
_____

OPINION OF THE COURT
_____

VAN ANTWERPEN, *Circuit Judge*.

　　Appellant Janeka Peace-Wickham filed a complaint in the United States District

Court for the District of Delaware against the Delaware River & Bay Authority

("DRBA") and its Chief Operating Officer James Walls, alleging, as relevant here,

violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. §§ 1981 and 1983.  The District Court granted Appellees' motion for summary judgment on all claims and Peace-Wickham appealed.  For the reasons that follow, we will affirm.

## I.

The parties are well acquainted with the factual and procedural background of this case, and therefore we will limit our discussion of the record to those facts bearing directly on our disposition of this appeal.

In December of 2005, Peace-Wickham, who is an African-American, began working for the DRBA as the Food and Retail Supervisor at the Delaware Memorial Bridge Facility Café.  Her job duties include ordering and purchasing inventory, supervising staff, ensuring timely food service, cooking and working at the cash register when needed, and assisting the Food and Retail Manager.  At the time of Peace-Wickham's hiring, a woman named Juanita Molletta, also an African-American, held the position of the Food and Retail Manager.  Molletta reported directly to Food and Retail Superintendant George Iannetta, a Caucasian, who oversaw all food and retail operations at the DRBA until his resignation on July 3, 2007.  Iannetta, in turn, reported to Chief Operating Officer Jim Walls, also a Caucasian.

Peace-Wickham points to events preceding her start at the DBRA as the source of ongoing racial tensions in the Café.  Peace-Wickham was hired to replace a former Café supervisor named Susan Clayton, a Caucasian.  Clayton was fired for organizing a work-stoppage in response to the DRBA's decision to hire Molletta, an outside candidate,

rather than promote her to the position. Peace-Wickham believes that this work-stoppage elevated racial tensions at the Café, and that many of her white coworkers were disobedient and disrespectful to her and other black employees as a result.

Shortly after Peace-Wickham started, the Café's regular cook went on medical leave. In her absence, Peace-Wickham was assigned to cooking duties on a full-time basis. Molletta and Anna Cheers, also an African-American, were chosen to assist. This arrangement lasted approximately three months, during which the three were too busy to take allotted work breaks. In response, Peace-Wickham complained to the DRBA's Equal Employment Officer, Consuela Petty-Judkins, also an African-American, that working full-time as a cook fell outside of her responsibilities as a supervisor. Moreover, she was troubled that she and the two other African-American employees assigned to cover cooking duties were frequently unable to take breaks while other white employees at the Café were able to. Following discussions with Walls and the DRBA's Chief of Human Resources, Petty-Judkins authorized Peace-Wickham to contact an outside temp agency for additional help in the Café. Despite this decision, Peace-Wickham and the other two employees assigned to cover for the cook often remained too busy to take their breaks during this three-month period. According to Peace-Wickham, when Iannetta learned that she had complained to Petty-Judkins, he confronted her and Molletta and "hollered" at them for not handling the issue on their own.

Over the course of her employment, Peace-Wickham experienced a number of incidents she believes are indicative of a racially charged work environment at the DRBA. On February 9, 2006, seasonal worker Amy Moriarty, a Caucasian female, filed

3

an internal harassment complaint alleging that Peace-Wickham threatened to "beat [her] white ass down."  After filing the complaint, which was dismissed later that month for lack of evidence, Moriarty took leave for several days.  Peace-Wickham filed her own internal complaint on February 23, 2006 denying Moriarty's allegations and claiming that Moriarty made racially discriminatory comments about her to coworkers.  Upon Moriarty's return, she was assigned to a different work location.  Although the DRBA immediately reassigned Moriarty in response to Peace-Wickham's complaint, it did not finalize its investigation for several months.

The DRBA took a number of actions to respond to the work-stoppage and racial tensions at the Café.  For about a year, beginning in April 2006, Walls held regular meetings with Molletta and Iannetta, during which he reviewed the performance, complaints, and interactions of all employees at the Café.  The DRBA additionally provided third-party counseling for Peace-Wickham and Molletta, assigned a Human Resource Generalist to provide onsite support, and consulted with them regularly concerning any ongoing problems.

In spite of these actions, several other incidents occurred.  Molletta reported that she heard a white DRBA employee make a statement about "lynching" directed at Peace-Wickham.  Peace-Wickham also overheard two DRBA employees who were purchasing food from the Café comment in response to apparent dissatisfaction that "back in the day, down South, blacks would have been hung for things like this."  Peace-Wickham reported this comment to Iannetta and Walls on April 7, 2006.  Iannetta and Walls asked Peace-Wickham if she could identify the individuals involved.  Additionally, Iannetta

4

asked her to immediately let him know if she saw them again. Peace-Wickham was unable to provide sufficient information, and she heard nothing further from Iannetta or Walls. Additionally, Peace-Wickham did not inform either individual when she later spotted one of the two employees again.

Around the same time, a white DRBA police officer named Denise Wise told Peace-Wickham that the Café had "changed" since Peace-Wickham's arrival and that she wanted Clayton back as a supervisor. Peace-Wickham believed these comments were motivated by racial animus based on prior indications that Wise thought there were too many blacks working in the Café. Peace-Wickham reported these comments to several people including Iannetta and Wise's supervisor. Wise was counseled about the sensitivity surrounding Clayton and informed that the incident would be formally addressed in her annual performance review. Wise was asked to apologize; however, she never did. No further incidents involving Wise were reported.

Sometime thereafter, Brenda Kennedy, a Caucasian employee who was a friend of Moriarty, crumpled up a receipt and threw it at Peace-Wickham's head. Peace-Wickham complained to Iannetta and others. Nonetheless, Kennedy reportedly threw a receipt a second time. Peace-Wickham communicated this incident once again. Iannetta stated that he spoke to Kennedy and made it clear that such conduct would not be tolerated.

On May 3, 2006, Peace-Wickham filed a Charge of Discrimination against the DRBA with the Delaware Department of Labor (DDOL) alleging the existence of a racially hostile work environment. Peace-Wickham objected to the comparative speed with which the DRBA resolved Moriarty's complaint as opposed to the delay she

5

experienced with final resolution of her own. She also objected to her continued assignment to "lesser duties." After considering Peace-Wickham's charge, the DDOL issued a Right to Sue Notice.

On May 19, 2006, Petty-Judkins forwarded Peace-Wickham's complaint to the DRBA's internal Discrimination/Harassment Complaint Committee. The Committee scheduled an interview with Peace-Wickham, though she called in sick that day. The meeting was instead held on June 8, 2006, the first possible time when all Committee members could meet. By that point, Moriarty had resigned. During the June 8 meeting, Peace-Wickham read a prepared statement, provided notes, and discussed recent incidents experienced in the Café. The Committee did not offer a formal opinion or recommendation due to reluctance by Peace-Wickham to amend the complaint or pursue a further investigation. Peace-Wickham challenges this characterization, and maintains that she was willing to cooperate with any additional action by the Committee.

Thereafter, Peace-Wickham expressed dissatisfaction with the process to Walls. In response, Walls asked for her input on how to better address her complaint. Peace-Wickham asked Walls to post anti-harassment signs and institute diversity training at the Café. The DRBA fulfilled both requests, and additionally required all employees to attend anti-harassment classes.

Several other incidents occurred in spite of these measures. In January 2007, a white Café employee named Bill Gilbert cleared every table in the premise except the one where Peace-Wickham and another black employee named Sandra McKinney were eating. McKinney filed a complaint, and Gilbert was subsequently transferred to a

6

different department. On April 9, 2007, Peace-Wickham returned to the Café to find an anonymous sign posted on the door reading "free at last, free at last, thank God we are free at last." The sign clearly referenced a famous quote by Dr. Martin Luther King, Jr. Peace-Wickham interpreted the sign as a personal attack, and refused take it down. Walls and others met with Peace-Wickham and conducted an immediate investigation that included interviews and a formal report; however, they were ultimately unable to identify the persons responsible.

In February 2007, Molletta cited Peace-Wickham for failing to abide by cash handling procedures after discovering a $68.14 shortage in bank deposits after Peace-Wickham worked the register. The missing amount was found the next day in a cash bag inside the register drawer. Peace-Wickham refused to sign the citation form. Molletta also did not sign the form, and never placed it in Peace-Wickham's official personnel file.

On May 1, 2007, Molletta resigned from the DRBA leaving the Food and Retail Manager position temporarily vacant. Soon after, Iannetta left the DRBA as well, leaving Walls temporarily in charge of Café operations. Thereafter, Peace-Wickham claims to have unofficially assumed Molletta's managerial duties at the request of Walls. As the next most senior employee, Peace-Wickham asked Walls on several occasions to officially reclassify her as the acting Food and Retail Manager, consistent with past practice, and in spite of the fact that she had been assigned to full time cashiering duties since February of 2007. Walls declined her request and informed her that the DRBA "would move forward in another direction" even though another manager advised him that Peace-Wickham could handle the job with additional training. During this time

7

period, Walls visited the Café more frequently, and according to Peace-Wickham, subjected her to increased scrutiny.

On June 4, 2007, Peace-Wickham filed a second Charge of Discrimination with the DDOL asserting retaliation for her prior complaints in the form of demotions, disciplinary actions, restricted duties, denied promotions, and harassment. Peace-Wickham pointed to her alleged violation of the cash handling policy as a pretext for the DRBA's actions. The DDOL dismissed the charge without making a finding, but issued another Right to Sue Notice. Additionally, on August 9, 2007, Peace-Wickham filed an internal grievance against Walls alleging that he "harassed and disrespected" her in retaliation for her prior complaints. Peace-Wickham also complained that Walls was restricting her duties and subjecting her to unwarranted scrutiny. The DRBA investigated this complaint by conducting separate interviews and ultimately concluded that Walls' actions were justified and not motivated by discriminatory intent.

Several months after Molletta's resignation, Walls hired an outside candidate named Mike Cattalo to manage the Café starting on August 15, 2007 and lasting until the position could be permanently filled. Walls maintained that he hired Cattalo rather than reclassifying Peace-Wickham because the Café was experiencing serious financial problems that required specific skills in retail restaurant management that Peace-Wickham lacked and Cattalo possessed. He also pointed to various performance concerns, including her: (1) failure to address employee performance issues when she witnessed them; (2) violation of the cash handling policy; (3) her decision not to take

down the "free at last" sign; and (4) frequent absences without notice during the work day.

On January 14, 2008, the DRBA formally posted the permanent Food and Retail Manager position and began accepting applications. Both Peace-Wickham and Cattalo applied and interviewed. Neither individual received an offer, and instead, the DRBA hired an outside candidate named Dana Herbert, an African-American, to fill the position. On March 31, 2008, Herbert began work as Peace-Wickham's direct supervisor.

Peace-Wickham reports that since July of 2008 DRBA management has shunned her, making performance of her job duties difficult. In addition, she asserts that management continues to ignore her concerns about understaffing and that the Café continues to require her to fill in as a cook and cashier.

On September 27, 2007, Peace-Wickham filed this civil action against the DRBA and Walls pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. §§ 1981 and 1983. Peace-Wickham alleged, as relevant here, that the DRBA and Walls violated her civil rights by: (1) subjecting her to a hostile work environment; (2) retaliating against her when she complained about racial discrimination; and (3) denying her a promotion due to her race. On August 17, 2009, both defendants moved for summary judgment on all counts. In a Memorandum of Decision and Order dated November 23, 2009, the District Court granted summary judgment in favor of the DRBA and Walls. Peace-Wickham timely filed an appeal on December 21, 2009.

The District Court exercised jurisdiction under 28 U.S.C. §§ 1331, and we have appellate jurisdiction over the final order under 28 U.S.C. § 1291.

9

**II.**

We review the District Court's grant of summary judgment de novo. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 727 (3d Cir. 1995). Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Upon a motion for summary judgment, the non-moving party, to prevail, must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We must grant all reasonable inferences from the evidence to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). A party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex*, 477 U.S. at 325). Moreover, "[w]here the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

**III.**

On appeal, Peace-Wickham challenges the District Court's grant of summary judgment in favor of the DRBA and Walls. As relevant here, Peace-Wickham alleges that the DRBA violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, by: (1) subjecting her to a hostile work environment; (2) retaliating against her when she complained about racial discrimination; and (3) denying her a promotion due to her

10

race.  Based on these same allegations, Peace-Wickham alleges that the DRBA violated 42 U.S.C. § 1981, and that Walls, acting in his individual capacity, violated 42 U.S.C. § 1983.  We will address each claim in turn.

## A.  Hostile Work Environment

Peace-Wickham first contends that the District Court erred in granting summary judgment on her hostile work environment claim.  To establish a Title VII claim for employment discrimination based on race and due to a hostile work environment, the appellant must show that: (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person of the same race in her position; and (5) the existence of *respondeat superior* liability.  *See Jensen v. Potter*, 435 F.3d 444, 448 (3d Cir. 2006) (internal quotations and citations omitted), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006); *Caver v. City of Trenton*, 420 F.3d 243, 262  (3d Cir. 2005).

Accordingly, to prove her hostile work environment claim, Peace-Wickham must show, *inter alia*, that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) (quotations omitted).  Factors which may indicate a hostile work environment include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening

11

or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). "[O]ffhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim. Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment." *Caver*, 420 F.3d at 262 (internal quotations and citations omitted). In assessing the severity of alleged discriminatory treatment, "we consider the totality of the circumstances," and our analysis "must concentrate not on individual incidents, but on the overall scenario." *Id.* at 262-63 (internal quotations and citations omitted).

In this case, the District Court concluded that Peace-Wickham failed to establish a prima facie case because she did not present evidence on which a reasonable jury could find vicarious liability on the part of the DRBA. As an initial matter, the court determined that a reasonable jury could find that severe or pervasive discrimination existed at the DRBA. Nonetheless, it concluded that Peace-Wickham's claim failed because she presented no evidence to support an inference of racial discrimination by her supervisors or a legally inadequate response on their part to remedy harassment by her coworkers. Although we do not as readily conclude that the evidence presented could support a determination that the discrimination at the DRBA was severe or pervasive, we need not definitively address this element as we agree with the District Court that Peace-Wickham cannot establish liability on the part of her employer.

As this Court has previously recognized, "[u]nder Title VII, much turns on whether the harassers are supervisors or coworkers. If supervisors create the hostile

12

environment, the employer is strictly liable, though an affirmative defense may be available where there is no tangible employment action." *Jensen*, 435 F.3d at 448 (internal quotations and citations omitted). Alternatively, an employer will be liable for harassing conduct committed by a victim's coworkers if the employer was "negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment." *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 26 (3d Cir. 1997) (citing *Bouton v. BMW of N. Am., Inc.*, 29 F.3d 103, 106 (3d Cir. 1994)). An employer is negligent if it "knew or should have known about the harassment, but failed to take prompt and adequate remedial action." *Jensen*, 435 F.3d at 453 (internal quotations omitted). Importantly, even if a remedial action does not effectively end the alleged harassment, it may still be legally "adequate" if it was "reasonably calculated" to do so. *See id.* (quoting *Knabe v. Boury Corp.*, 114 F.3d 407, 412-13 (3d Cir. 1997)).

The District Court concluded that Peace-Wickham's supervisors did not create a hostile work environment at the DRBA. We agree. Even viewing all of the facts in a light most favorable to Peace-Wickham, and considering the totality of the circumstances, we believe that no reasonable jury could find that her supervisors discriminated against her in the ways required to create a hostile work environment. In arguing otherwise, Peace-Wickham points to several acts by management, including: her reassignment to cooking and cashiering duties for an extended period of time; her and other African-American employees' frequent inability to take allotted breaks; the relative delay she experienced in final resolution of her complaint against Moriarty; Walls' refusal to reclassify her to the Acting Food and Retail Manager position; and finally, the

13

fact that her supervisors continue to ignore her complaints about understaffing and other work related issues. According to Peace-Wickham, each of these incidents gives rise to at least a genuine issue of material fact as to whether she suffered severe or pervasive discrimination by her supervisors. We disagree.

None of these incidents are sufficiently probative of racial animus to permit a reasonable jury to find her supervisors directly liable for creating a racially hostile work environment. Upon hiring, Peace-Wickham was well aware that her duties included cashiering and cooking on an as-needed-basis. Additionally, these reassignments were clearly tied to unanticipated departures of other employees. In the first instance, Peace-Wickham began filling in for a cook who was out on medical leave. In the second instance, Peace-Wickham filled in as a cashier due to similar understaffing issues, exacerbated by Moriarty's reassignment and subsequent resignation. Peace-Wickham's deposition testimony also indicated numerous occasions wherein she performed other tasks above and beyond cooking and cashiering, consistent with the broad scope of her position as a Café supervisor. For example, she described spending sometimes two to three hours each day formulating menus for upcoming weeks, corresponding with Human Resources regarding employee time recording issues, and running various errands to obtain supplies and other items for the Café. When she complained of an inability to take breaks, the DRBA gave her permission to hire additional labor from an outside agency.

The other incidents she points to are similarly lacking. Even though the DRBA took more time to finalize Peace-Wickham's complaint than her white coworker Moriarty's, it nonetheless took immediate action to address the underlying problem.

14

Additionally, Peace-Wickham presents no evidence to establish a discriminatory motive behind her supervisor's experience-and performance-based reasons for refusing to reclassify her to the Acting Food and Retail Manager position. Finally, the DRBA's continued inattention to understaffing issues is not independently probative of racial animus. Nor does it become so when considered in light of the overall circumstances alleged by Peace-Wickham.[1] For these reasons, we agree with the District Court's determination that Peace-Wickham cannot show discrimination on the part of her supervisors.

We next address whether Peace-Wickham is able to establish *respondeat superior* liability by showing that the DRBA provided an inadequate remedial response to racial harassment by her coworkers. *See Bonenberger*, 132 F.3d at 26. Here, the record convinces us that the DRBA's remedial measures were adequate as a matter of law. As

---

[1] Notably, the record is devoid of any overtly discriminatory statements or conduct by her supervisors. We acknowledge that overt racial harassment is not required to show intentional discrimination. In *Aman v. Cort Furniture Rental Corp.*, this Court indicated that acts of harassment need not be "accompanied by racially discriminatory statements." 85 F.3d 1074, 1083 (3d Cir. 1996). Nonetheless, the presence or absence of such conduct often proves helpful when evaluating whether facially neutral conduct is driven by invidious motives. *See Cardenas v. Massey*, 269 F.3d 251, 262 (3d Cir. 2001) (reasoning that in light of a supervisor's overtly discriminatory comments, the facially neutral management decisions complained of constituted evidence "from which a jury might find ethnic animus underlying other ostensibly nondiscriminatory incidents."); *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005) (finding that a plaintiff could not meet the first element of a hostile work environment claim where the plaintiff was neither on the receiving end nor the subject of any overt comments). As in *Cardenas* and *Caver*, Peace-Wickham points only to facially neutral conduct on the part of her supervisors in alleging that they treated her in a racially discriminatory manner. The fact that she cannot point to any overtly discriminatory conduct on the part of her supervisors lends further support to our conclusion that she cannot show their direct responsibility for any hostile work environment that might have existed at the DRBA.

noted, when Peace-Wickham filed a complaint against her coworker Moriarty, the DRBA promptly transferred Moriarty to another post, effectively addressing the substance of her complaint in a manner reasonably calculated to stop further harassment. The fact that the DRBA took several months to finalize its investigation does not render the response legally inadequate, especially given that they reassigned Moriarty immediately upon her return. *See Jensen*, 435 F.3d at 453 (denying summary judgment in favor of an employer where a nineteen month delay occurred between notification and remedial action); *Bonenberger*, 132 F.3d at 26 (denying summary judgment in favor of an employer when evidence indicated that the employer took no action whatsoever for three months). Moreover, the DRBA revised its internal policies in an effort to improve the consistency and speed with which it dealt with such complaints.

The DRBA took similarly adequate measures to respond to Peace-Wickham's complaints about other employees, including investigations and formal reprimands. In addition to conducting timely investigations, reprimanding employees, and transferring employees as needed, the DRBA instituted weekly meetings with Peace-Wickham's supervisors to ensure that all issues would be appropriately communicated and timely addressed. Additionally, the DRBA provided third-party counseling. When Peace-Wickham proposed further steps, the DRBA not only responded by posting warnings and arranging mandatory diversity training, but also required all employees to attend anti-harassment classes. Taken together, these steps fall comfortably within the realm of legally adequate remedial measures.

16

Finally, we reject Peace-Wickham's insinuation that the legal adequacy of the DRBA's remedial measures should be judged according to whether they effectively prevented future instances of workplace harassment. As we made clear in *Knabe*, the legal adequacy of remedial measures is not solely dependent upon their ultimate effect, but rather whether they were "reasonably calculated" to end the harassment. *Knabe*, 114 F.3d at 413. Moreover, we are unwilling to step into the shoes of DRBA management, as urged by Peace-Wickham, and make highly particularized judgments as to whether the DRBA should have docked pay, demoted, or withdrawn certain fringe benefits instead of following the course of action chosen here. *See id.* at 414 ("[T]aking punitive action against the harassing employee, e.g., reprimand, suspension or dismissal, is not necessary to insulate the employer from liability for a hostile work environment.") Title VII does not mandate a specified course of action for all instances of workplace harassment, and neither will we. *See id.*

Because Peace-Wickham fails to present evidence on which a reasonable jury could find the DRBA vicariously liable, we will affirm the District Court's grant of summary judgment on her hostile work environment claim.

## B. Retaliation

Peace-Wickham also contends that the District Court erred in granting summary judgment on her retaliation claim. To establish a prima facie case of retaliation, Peace-Wickham must demonstrate that: (1) she engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the

17

adverse action. *See Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001); *Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1999). A causal link between protected activity and adverse action may be inferred from an unusually suggestive temporal proximity between the two, an intervening pattern of antagonism following the protected conduct, or the proffered evidence examined as a whole. *Kachmar*, 109 F.3d at 177.

Here, neither party disputes that Peace-Wickham engaged in protected activity by filing various complaints for allegedly discriminatory conduct. Instead, the relevant inquiry centers on whether Peace-Wickham established a prima facie case by satisfying the second and third element described above. If she is able to satisfy these elements, we must then ask whether she is able to rebut the legitimate, non-discriminatory reasons presented by the DRBA, as required by the familiar *McDonnell Douglas* burden-shifting framework applicable to this claim. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

The District Court concluded that Peace-Wickham failed to make a prima facie case for retaliation, and reasoned further that even assuming she did, that she presented insufficient evidence to counter the legitimate, non-discriminatory reasons provided by the DRBA and Walls. We agree.

Peace-Wickham alleges that the DRBA retaliated against her in the following ways: through a hostile work environment; by reassigning her to menial tasks including cooking and cashiering; by failing to investigate or conducting an intentionally ineffective and negligently indifferent investigation into her complaints of racial

18

harassment; by shunning her and ignoring her ongoing concerns; by refusing to reclassify her to the acting Food and Retail Manager position; and by subjecting her to increased scrutiny following Molletta's departure.

Although creating or permitting a hostile work environment can constitute a materially adverse employment action, *see Jensen*, 435 F.3d at 448, vicarious liability remains necessary to establish this basis, *see Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999). For the reasons discussed, *supra* II. A., Peace-Wickham cannot establish vicarious liability on the part of the DRBA, and therefore she cannot base her retaliation clam upon the alleged hostile work environment.

Moreover, we agree with the District Court that Peace-Wickham cannot establish a sufficient causal relationship between her protected activities and her reassignment to cooking and cashiering duties. As the District Court noted, Peace-Wickham's reassignment to cooking duties predated all of her protected activities. Similarly, we agree that the reassignment to cashiering in February of 2007, eight months after her most recent complaint, is too attenuated of a link to establish causality, especially in light of the dearth of evidence suggesting that this decision was motivated by retaliatory intent. *See Kachmar*, 109 F.3d at 177.

Additionally, there is no evidence on which a reasonable jury could conclude that the DRBA failed to investigate or conducted an intentionally ineffective and negligently indifferent investigation into her complaints of racial harassment. To the contrary, the record indicates that the DRBA took steps to investigate and address Peace-Wickham's complaints at each turn. Even if their efforts at times failed to prevent future incidents of

19

harassment, there is no indication that the DRBA or Walls acted in an intentionally ineffective or negligently indifferent manner. We also conclude that Peace-Wickham's allegations of shunning do not amount to an adverse employment action. Even treating these allegations as true, she cannot show that the lack of receptiveness to her complaints of continued understaffing and other unspecified issues "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68.

Finally, we also agree with the District Court that even if Walls' refusal to designate Peace-Wickham Acting Food and Retail Manager along with his increased scrutiny of her support a prima facie case for retaliation, Peace-Wickham cannot rebut the legitimate, non-retaliatory explanations provided for his actions.[2] In defense of his decision, Walls pointed to a number of performance-and experience-based reasons that Peace-Wickham asserts are pretextual. Peace-Wickham attacks Walls' averred reasons by disagreeing with his performance assessments, questioning his judgment and professional experience, and by offering alternative explanations for her conduct. In

---

[2] We note that contrary to Peace-Wickham's characterization (Reply Br. at 4.), the District Court never conclusively determined that Walls' decision against reclassifying her to the Acting Manager position satisfied each of the elements required to establish a prima facie case. Instead, the court simply noted that "there [was] stronger temporal evidence" to suggest a causal link between Peace-Wickham's complaint about the "free at last" sign and Walls' decision not to reclassify her. (App. at 25-26.) The court then reasoned, "even assuming this evidence to establish a causal link, however, Peace fails to answer Walls' legitimate, non-retaliatory explanations for his actions." (*Id.*) Thus, rather than determining that a prima facie case had been established, the court simply assumed this conclusion in order to reach her pretext arguments. Because we conclude that Peace-Wickham cannot discredit Walls' legitimate non-retaliatory reasons, we need not definitively resolve whether she has satisfied each element of the prima facie case for retaliation.

20

order to discredit an employer's proffered reasons, "the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (internal citations and quotations omitted). The evidence presented by Peace-Wickham consists largely of her own bare assertions and unsupported opinions offered to contradict Walls' explanations. Unsupported retorts do not cast sufficient doubt to overcome the threshold we articulated in *Fuentes*. *See id.* Even considered in aggregate, Peace-Wickham fails to sufficiently discredit the performance- and experience-based reasons provided by Walls and DRBA.[3]

Similarly, Peace-Wickham cannot discredit Walls' explanations for why he subjected her to increased scrutiny. Walls was temporarily assigned to oversee Café operations after Molletta and Iannetta departed. As a result, he assumed direct managerial responsibilities over Peace-Wickham and other Café employees. It is no surprise that he would more closely scrutinize Peace-Wickham after assuming supervisory responsibility over her. Moreover, the Café was experiencing significant financial problems, further substantiating Walls' explanations for the increased scrutiny.

---

[3] Peace-Wickham asserts that the District Court erred by requiring her to directly contradict each proffered reason offered by Walls and the DRBA. If the court had indeed held Peace-Wickham to such a burden, it would have committed error. *See Fuentes*, 32 F.3d at 764 n.7. We find no indication, however, that the District Court required Peace-Wickham to cast doubt on each and every legitimate, non-retaliatory explanation offered by Walls and DRBA.

21

Accordingly, we will affirm the District Court's grant of summary judgment on Peace-Wickham's retaliation claim as well.

### C. Failure to Promote

Peace-Wickham next asserts that the District Court erred when it concluded that she failed to present evidence that she was qualified for the position of Acting Food and Retail Manager, thereby supporting the decision to grant summary judgment on her failure to promote claim. In order to establish a prima facie case for failure to promote, Peace-Wickham must show that: (1) she belongs to a protected class; (2) she applied to and was qualified for an available position; (3) despite her qualifications, she was rejected; and (4) after she was rejected the position remained open and the DRBA continued to seek applications from persons with her qualifications. *See McDonnell Douglas*, 411 U.S. at 802. The parties dispute whether Peace-Wickham needed to show that she was more qualified than Cattalo, whom the DRBA ultimately hired, or whether she only needed to show that she possessed minimum qualifications for the job.

Although there is support in our prior jurisprudence for both views,[4] we need not resolve this dispute today for Peace-Wickham is unable to show that she possessed even the minimum qualifications required. Walls testified that the Café was experiencing serious financial difficulties related to inventory management, portion control, price

---

[4]     *Compare Ezold*, 983 F.2d at 523 (holding that an attorney who claimed she was passed over for law firm partnership because of her gender need only show at prima facie stage that "[s]he was sufficiently qualified to be among those persons from whom a selection . . . would be made" (citation omitted)) *with Jewett v. Int'l Tel. & Tel. Corp.*, 653 F.2d 89, 91 (3d Cir. 1981) (holding in failure-to-promote context that plaintiff failed to make out prima facie case because person who was promoted had "superior qualifications").

analysis, waste tracking, and manpower utilization and that he sought to hire an individual to fill the temporary position who possessed a background in restaurant management. With more than 20 years of experience as a general manager at several restaurants, Cattalo possessed skills that were directly applicable to the various financial problems Walls sought to remedy.

In contrast, Peace-Wickham lacked the skills and experience required to deal with these issues. Even viewing the facts in a light most favorable to her, the record does not indicate otherwise. That Peace-Wickham may have essentially acted as the unofficial Acting Manager in the months between Molletta's departure and Cattalo's hiring does not render her qualified to meet the future business needs of the Café. Moreover, Peace-Wickham's reliance on a single Food Service Manager's opinion that she would be qualified for the job *with additional training* actually undercuts her assertion that she possessed the minimum qualifications required. When analyzing a Title VII claim for failure to promote, we look to a candidate's qualifications as they existed at the time the hiring decision was made, not their potential to be qualified at some point in the future. *See McDonnell Douglas*, 411 U.S. at 802.

Because we conclude that Peace-Wickham cannot establish a prima facie case for failure to promote, we will affirm the District Court's grant of summary judgment on this claim.

### D. Section 1981 Claim

Peace-Wickham additionally claims that the District Court erred in granting summary judgment on her claim against the DRBA brought under 42 U.S.C. § 1981,

which provides that "all persons . . . shall have the right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of the laws and proceedings . . . as is enjoyed by white citizens." As this Court has explained, the substantive elements of § 1981 claims are generally identical to those of employment discrimination claims brought forth under Title VII. *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009) (citing *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir. 1999)).

Because we hold that Peace-Wickham has failed to establish a violation of Title VII based on the alleged acts of discrimination discussed above, we will affirm the District Court's grant of summary judgment on her § 1981 claims as well.

### E. Section 1983 Claim

Peace-Wickham also contends that the District Court erred in granting summary judgment on her claim against Walls brought under 42 U.S.C. § 1983. Plaintiffs alleging claims of racial discrimination under § 1983 must make a showing similar to, but distinct from, the showing required for race discrimination claims brought under either § 1981 or Title VII. To present a claim under § 1983, Peace-Wickham needed to show that Walls intentionally discriminated against her on the basis of her race. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990). Claims that a supervisor participated in alleged discriminatory behavior must be supported by evidence of personal involvement by the supervisor, or evidence that the supervisor possessed actual knowledge of the discriminatory behavior of others and acquiesced to their improper conduct. *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir. 1995).

24

For the reasons discussed *supra* II. A., we conclude that Peace-Wickham presented insufficient evidence to show intentional discrimination or acquiescence by Walls. Accordingly, summary judgment was appropriate with regard to her § 1983 claim against him.

## IV. Conclusion

For the aforementioned reasons, we will affirm the District Court's grant of summary judgment on each of Peace-Wickham's claims against the DRBA and Walls.